## BOYNTON LUMBER CO. et al. v. HOUSTON OIL CO. OF TEXAS. (No. 41.)*

(Court of Civil Appeals of Texas. Beaumont. May 25, 1916. On Rehearing, Nov. 16, 1916.)

1. BOUNDARIES ⬥3(1)—DETERMINATION.

The rule for determining suits involving boundary lines is to determine, first, whether or not the lines of the survey sought to be located were actually traced upon the ground when the survey was made, and to find and identify such lines, following in the footsteps of the surveyor who located the survey and the corners, marks, and natural objects found on the ground must control course and distance; the intention and purpose being to locate and identify the survey as actually made on the ground.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 3, 5; Dec. Dig. ⬥3(1).]

2. APPEAL AND ERROR ⬥1002 — REVIEW — JUDGMENT—SUPPORT IN EVIDENCE.

If the judgment of the trial court is supported by the evidence, although it may be conflicting, it is the duty of the Court of Civil Appeals to affirm.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3935–3937; Dec. Dig. ⬥1002.]

3. BOUNDARIES ⬥3(6)—MARKED LINE—CONTROLLING COURSE AND DISTANCE.

The rule is that for a marked line or corner to control a call for course and distance, it must be identified upon the ground.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 24–29; Dec. Dig. ⬥3(6).]

4. BOUNDARIES ⬥6—CALLS IN FIELD NOTES —FOLLOWING ORDER.

Calls in field notes should be followed in the order given, unless the call for a more recent line is more definitely located, and shows more certainly the footsteps of the surveyor.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 47–57; Dec. Dig. ⬥6.]

5. APPEAL AND ERROR ⬥1071(1)—HARMLESS ERROR.

In trespass to try title wherein boundaries were in dispute, where there was sufficient evidence to show the location of the original north and west lines of a survey as they were run originally in locating such survey, error in giving probative force to subdivisions of other surveys as controlling the location of the first was harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4234; Dec. Dig. ⬥1071(1).]

Middlebrook, J., dissenting.

### On Rehearing.

6. JUDGES ⬥15(1)—COURT OF CIVIL APPEALS —DISQUALIFICATION OF JUDGE—CONSTITUTION.

Under Const. 1876, art. 5, § 11, as amended September 22, 1891, providing that when the Supreme Court, the Court of Criminal Appeals, the Court of Civil Appeals, or any member of either, shall be disqualified to determine any case, the fact shall be certified to the Governor, who shall immediately commission the requisite number of persons learned in the law for the trial and determination of such cause, where a justice of a Court of Civil Appeals was recused, a special associate justice was properly appointed by the Governor to sit in the cause, and the court as thus composed was legally constituted, though Vernon's Sayles' Ann. Civ. St. 1914, art. 1584, providing that when any two of the members of the Court of Civil Appeals shall be disqualified, the Governor shall commission the requisite number of persons to try the cause, follows the language of Const. art. 5, § 11, as it stood before amendment.

[Ed. Note.—For other cases, see Judges, Cent. Dig. §§ 48–50; Dec. Dig. ⬥15(1).]

7. COURTS ⬥247(6) — COURT OF CIVIL APPEALS—CERTIFICATION TO SUPREME COURT —STATUTE.

Where the only question for determination by a Court of Civil Appeals involved the location of boundary lines, it was not incumbent on the court, because of the dissent of a justice, to certify the cause to the Supreme Court under Vernon's Sayles' Ann. Civ. St. 1914, art. 1620, providing for such certification on a dissent, since the statute does not apply where Courts of Civil Appeals have final jurisdiction, as in case of boundary only.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 751; Dec. Dig. ⬥247(6); Appeal and Error, Cent. Dig. § 1773.]

8. APPEAL AND ERROR ⬥828—REARGUMENT.

Where a case was regularly set on the docket of a Court of Civil Appeals for submission, and was, on the day of its submission, orally presented to the court, appellant was not entitled to have the case orally reargued after the Governor appointed a special associate justice to sit in place of a justice recused, since the pres-

entation of any further argument was a matter of grace or invitation from the court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3209–3246; Dec. Dig. ⏁ 828.]

Appeal from District Court, Newton County; A. E. Davis, Judge.

Action by the Houston Oil Company of Texas against the Boynton Lumber Company and others. From a judgment for plaintiff, defendants appeal. Judgment affirmed.

The following is a copy of the "Priest Map" referred to in the dissenting opinion:

low and the Boynton Lumber Company et al., appellants, were defendants, and the cause was tried before the court without a jury. Judgment was rendered for the Houston Oil Company of Texas for the land in controversy and for $364.96, with legal interest thereon, for damages for cutting timber from the land, from which judgment the Boynton Lumber Company et al. have appealed, and upon proper bill of exceptions and assignments of error bring this cause to this court for determination. The matters at

Holland & Holland, of Orange, for appellants. H. O. Head, of Sherman, and Parker & Kennerly, Fred L. Williams, and Jesse J. Lee, all of Houston, for appellee.

DUFFIE, Special Judge. This was an action of trespass to try title and for damages for cutting timber growing upon the land herein sued for, where the appellee, the Houston Oil Company of Texas, was plaintiff be-

issue in this cause can and should be classified as follows:

First. The location of the boundary line between the W. A. Armstrong survey and the Richard Sims league.

Second. The boundary line between the south part of the N. H. Cochran survey and the said Richard Sims league, the appellee owning the Armstrong and Cochran surveys and the appellants that portion of the

Sims survey not in conflict with the Armstrong and Cochran surveys, therefore the questions to be determined by the court below, which are now before us for review, relate to the locations of the north and west lines of the Sims league. The map marked "A" is made a part of this opinion, and is here inserted to more fully explain the issues herein involved.

The John T. Lewis is the oldest survey of the several surveys shown by this map. The Richard Linville league was located on June 30, 1835, and the Sims on the same day by the same surveyor, the N. H. Cochran was surveyed April 24, 1838, and the W. C. Armstrong in 1841. The solid lines (as shown by the map) on the lines on the west and north of the Sims league show their location as

found by the trial court, which are in accord with the appellee's contention, the dotted lines on the north and west showing the lines contended for by the appellants as the boundary lines of the Richard Sims league. The northeast corner of the Sims league is an established corner, and is agreed upon by all the parties to this litigation as being the original northeast corner.

Appellants contend that the Sims league should be located by beginning at the point agreed upon as the northeast corner and running from that point the course and distance as called for in the field notes, while the appellee contends that the lines are as shown to have been originally run by the surveyor locating the Sims league, and, the trial court having found in accordance with such contention, such judgment, if upheld by the evidence, should be affirmed.

Under appellants' assignments of error Nos. 1, 2, and 3, the judgment of the trial court is attacked as being contrary to the law and evidence, under the contention that, the northeast corner of the Sims league being well defined and agreed upon, and no other corners on said survey being established, the Sims league should be located from that corner by following the course and distance as called for in the original field notes, and as thus located the land in dispute would be on the Sims league.

[1] The rule for determining suits involving boundary lines is to determine, first, whether or not the lines of the survey sought to be located were actually traced upon the ground at the time the survey was made, and to find and identify such lines, following in the footsteps of the surveyor who located the survey, and the corners, marks, and natural objects found on the ground must control, and should control, course and distance; the intention and purpose being to locate and identify the survey as actually made upon the ground. State v. Palacios, 150 S. W. 229; Byrd v. Langbein, 135 S. W. 206.

[2] If the judgment of the trial court is supported by the evidence, although it may be conflicting, it is the duty of this court to affirm same.

[3] It will be well at the outset to bear in mind that the rule is that for a marked line or corner to control a call for course and distance it must be identified upon the ground. Goodsan v. Fitzgerald, 40 Tex. Civ. App. 619, 90 S. W. 901; Fagan v. Stoner, 67 Tex. 287, 3 S. W. 44; Bingham v. McDowell, 69 Tex. 100, 7 S. W. 315.

[4] It also must be borne in mind that calls in field notes should be followed in the order given, unless the call for a more recent line is more definitely located, and shows more certainly the footsteps of the surveyor. Daughtrey v. McCoy, 135 S. W. 1060.

The facts and conclusion of law made by the findings of the trial court are as follows:

"(1) From the agreement made in this case, it appears that the land in controversy was claimed by the plaintiff to be on the W. C. Armstrong survey, and the N. H. Cochran survey, while the defendants claim such land to be located entirely on the Richard Sims survey, so that the issue in the case is as to the correct west boundary of the Richard Sims and the east boundary of the Nathaniel Cochran, said surveys being adjoining; and as to the north boundary of the Richard Sims and the south boundary of the W. C. Armstrong, said surveys being contiguous and adjoining. The Richard Sims is the oldest of the three surveys.

"(2) I find that the true northeast corner of the Richard Sims survey has been located by the evidence in this case, and that all the witnesses, both for the plaintiff and the defendants, agree to the location, and that the original bearing trees are on the ground.

"(3) I find that the plat introduced in evidence by the defendants made by the witness R. W. Priest correctly shows the work done by him on the ground, and shows the relative position of the west boundary line of the Sims, and I find that at the corner treated by the witnesses for plaintiff as the southwest corner of the Richard Sims (the true southwest corner of the Richard Sims being the beginning corner of said Sims) there is now standing, at the proper course and distance, a magnolia tree, a block from which was cut out and introduced in evidence in this case, and showed, judging the diameter from the block, to have been about 12 or 14 inches in diameter. Said block itself appears to have been cut out to a depth of about one-third of the diameter of said tree, and said block itself showed about 50 rings, and showed to be old enough for the original bearing tree; but no marks were shown to have been upon it.

"(4) I find that the southwest corner, as claimed by the plaintiff, is at the distance of 100 varas from Cow creek, and that Cow creek is crossed on the course as called for in the Linville field notes, and that said creek is running at the course called for in said notes where said line crosses it, the call in the Linville field notes from this corner, which the Sims field notes begin at, 'thence N. 80 E. Cow creek, 15 vrs. wide, course southeast.'

"(5) I find that the southwest corner of the Sims league as claimed by the defendants is west 100 varas from this point, plus distance between plaintiff's southwest corner and defendants' southwest corner as shown by the plats.

"(6) I find that the M. B. Lewis league on the west and south of the Richard Sims and the John T. Lewis on the west and south are both senior surveys to both the Linville and Sims, and are called for in the Richard Linville original English field notes, and the Richard Linville field notes and the Richard Sims field notes were made by the same surveyor on the same day.

"(7) I find that, extending the west boundary line of the Sims league as claimed by the plaintiff to a point south of the course as called for in the Linville field notes, there is an old marked line old enough to be the original boundary line between the Martin B. Lewis and the Linville leagues, and that the southeast corner of the Martin B. Lewis league is located on this line, as is the northwest corner of the Linville. The map shows the east boundary of the Martin B. Lewis to strike the north boundary of the John T. Lewis. I find this line to be the west boundary line of the Linville and west boundary line of the Sims.

"(8) I find, further, that the northeast corner of the John T. Lewis is located east of this last-described corner at a distance called for in the field notes and on the course called for; the field notes on the Linville being patently reversed therein as to this call, calling S. 80° E. 120 varas, with north boundary of the John T. Lewis to corner being M. B. Lewis southeast corner.

"(9) I find that the subdivisions on the Mar-

tin B. Lewis and on the John T. Lewis and Richard Sims of these surveys are made recognizing the west boundary line of the Richard Sims as located by the plaintiff, and that there are no corresponding subdivisions recognizing as the west boundary of the Richard Sims league line claimed by the defendants, and I find that the plat introduced in evidence by the plaintiffs, showing the subdivisions on the Martin B. Lewis and John T. Lewis and Richard Sims, correctly shows them.

"(10) I find that the west boundary line as claimed by the plaintiffs for the Sims is the line that has been generally recognized by the persons in that country, and generally reputed and understood to be the true west boundary line of the Richard Sims league.

"(11) I find that beginning at plaintiff's southwest corner there is an old marked line running to the corner established by plaintiffs as the northwest corner of the Richard Sims league, but that this line runs north 12 degrees and 45 minutes west, as shown on the plat introduced, and that in running this course, sometimes the line is on one side and sometimes on the other; that said line continues at this course till at 2,161 varas it crosses the southeast corner of the Nathaniel H. Cochran as claimed by plaintiff; and from this point on, in order to trace the line on the ground, it takes a course north 10 degrees, 50 minutes west.

"(12) I find this line to have been marked for at least 48 years, and that it is the oldest line for the west boundary of the Sims, that could be the west boundary of the Sims, of any line in the country around.

"(13) I find that at the northwest corner, as located by the plaintiffs, there is a post oak which fits very well for the one of the bearings called for in the Sims notes, and that there is evidence of a pine that stood south 70° E. 2.6 varas. I find, further, that the Sims notes called this tree to be an oak, while the Cochran field notes called it to be a pine. I find said pine to have been the original bearing tree.

"(14) I find that there is an old corner on plaintiff's west line of the Sims, where the division line of the Sims league crosses said line, as old as said division line itself.

"(15) I find that at the point where the division line of the Sims league would cross the west boundary line of the Sims, as it is placed by defendant's surveyors, if said division line be extended, there is no corner and there are no old marks on this line after it passes the corner last mentioned.

"(16) I find that there is not shown by the evidence in this case any line for the Cochran east boundary line unless that shown by the plaintiffs as the east boundary line of the Cochran and the west boundary line of the Sims is in fact the boundary line of the Cochran, and I find that the subdivisions in the Cochran league have recognized the line claimed by the plaintiffs as being the true boundary line between the Cochran and the Sims, and that there are, on the other hand, no subdivisions in the Sims or the Cochran.

"(17) I find that the Cochran field notes call to cross Thickety creek, a branch of Cow creek, at a distance of 460 varas from their southeast corner, and that the line of the plaintiff crosses said creek at a distance of 440 varas, and the line of the defendants could not cross it at a distance of less than 866 varas from the south line of the Cochran league, and I find that the south line of the Cochran league is plainly marked on the ground.

"(18) I find that the corner located by the plaintiff as the southeast corner of the Richard Sims league and the northeast corner of the Richard Linville has been recognized generally as such corner, and that the D. S. D. Moore league and the David Hughes pre-emption corner at this corner. There is no evidence that any of the surveys using the northeast corner of the Richard Linville and the southeast corner of the

Richard Sims have for such corner the point marked by defendants as their southeast corner. There is no evidence of any lines leading southwards from the corner claimed by the defendants as the southeast corner of the Sims, and the evidence does show that there are old lines leading off from plaintiff's southeast corner in right course for the Linville, D. S. D. Moore, and the David Hughes, which have been identified.

"(19) I find that the line connecting the true northeast corner of the Sims and the southeast corner of the Sims is the line claimed by plaintiff, and is the true southeast corner.

"(20) I find that there is a plainly marked old line where the plaintiff claims the Nathaniel H. Cochran south boundary line to be, and that there is no line running north and south from the point where the defendant's line crosses the line located as the south boundary line of the Cochran.

"(21) I find that at a distance of about 25 varas beyond the distance of 5,000 varas called for in the Sims notes as the south boundary from the southeast corner of the Sims as located by defendants, there is a magnolia tree large enough to have been the original tree called for in the Sims field notes at the southeast corner.

"(22) I find that there is no line running from the plaintiff's southwest corner N. 10° W. as called for in the Sims notes, and I also find that there is no line so running from the southwest corner as claimed by the defendants.

"(23) I find that from the Sims northwest corner the Cochran calls for another 1,861 varas east on the north line of the Sims, but that this corner is located, as a matter of fact, 2,114 varas from the northwest corner of the Sims, and there is a line running north 10 west from that point, and at about 1,500 varas said line crosses a branch, and that the said Cochran field notes call for such a line and for the branch at 1,530 varas and I find that there is no evidence of any other line running from the north boundary line of the Sims crossing said branch.

"(24) I find at the northwest corner of the Sims, as claimed by the defendants, there is a bay tree with marks some 10 or 12 years old, and that there formerly was an old stump hole which would fit fairly well for one of the bearing trees called for, and that said corner was established as a corner of the N. B. Lewis 160-acre claim on the Cochran many years subsequent to Cochran's location.

"(25) I find that if a line were run from the recognized northeast corner west for a distance as called for in the Sims notes, it would fall short 101 varas of defendant's northwest corner, and would pass the plaintiff's northwest corner at a distance of about 223 varas.

"(26) I find that the length of the south line of the Sims from the southeast corner and the southwest corner of same, established by plaintiffs, is 4,880 varas, and the call for said line in the Linville notes is as follows: Running from the southwest corner; 'thence north 80 degrees east 100 varas Cow creek, 15 varas wide, course southeast, 4,860 varas, post and mound'; and that the call in the Sims notes for this line is 5,000 varas.

"(27) I find that the west line of the plaintiff and the west line of the defendants of the Sims survey fit reasonably well and call for the branch of Cow creek in the Sims notes, but that plaintiff's line crosses Cow creek many times that it does not call for.

"(28) I find that fitting as a bearing tree, the magnolia found by the witness Priest at his southwest corner that there are two or three blazes going north 10 west from there, but it does not appear from the evidence whether they are as old, or older, than the marks on the plaintiff's west line, but they are old marks.

"(29) I find, from the original field notes of the Richard Sims and the Richard Linville, that

they call for exactly the same bearing trees for the Linville northwest corner and the Sims southwest corner, its beginning corner, except that the Sims calls for a magnolia 10 inches in diameter, south 85 degrees east 10 varas, and a hackberry 8 inches in diameter bearing south 64 degrees west 5.2 varas; while the Linville calls for a magnolia 10 inches in diameter south 55° east 10 varas, and a beech 8 inches in diameter south 64° west 5.2 varas, according to the field notes of the said survey introduced in evidence in the trial of the case of Kirby v. Williams while from the notes introduced in the case of Houston Oil Company v. Boynton Lumber Company it appears that the Sims notes do not call for a hackberry, but call for a beech, as in the Linville notes, the only difference between these Sims notes and the Linville notes being the difference of south 55° east in one of them, and south 85° east in the other, as noted above.

"(30) I find that the northwest corner, taken by defendants as the true northwest corner, was established in recent years as the corner of Mr. Martin Lewis' subdivision on the Cochran, and that it was established for him by Mr. Halliday.

"(31) I find that the west line, claimed by the plaintiff, crosses Thickety creek, a branch of Cow creek, but one time, at a distance of about 3,100 varas; that it then goes up the creek on the west side and finally crosses on the north side of the tramroad at about the distance called for in the Sims notes; that when it crosses, the course of the creek is east.

"(32) I find that the total distance of the south line of the Sims from the defendant's southeast corner to the magnolia as his southwest corner is 5,028 varas, and that the southeast corner of the Sims as located by defendants is 368 varas west of the southeast corner as located by the plaintiff, and that defendant's southwest corner is 408 varas west of the southwest corner of plaintiff.

"(33) I find that there are no marks between the northwest corner as claimed by the plaintiff and the northwest corner as claimed by defendants old enough to have been the original marks.

"(34) I find that testimony as to the amount of timber cut by the defendant, Williams, in the case of Kirby v. Williams, and by the other defendants in that case, is undisputed, and is as testified to by plaintiff's witnesses; and that the amount of timber cut in the case of Houston Oil Company of Texas v. Boynton Lumber Company is as shown by the memorandum introduced by Mr. McMahon, which shows that there was 130,165 feet cut from the conflict with the Sims and Cochran, and that there was 15,820 feet cut from the conflict between the Sims and the Armstrong.

"(35) I find that the timber in these conflicts was cut by defendants in good faith, believing, and having reasonable grounds to believe, that said timber was located on lands owned by them.

"(36) I find, as agreed, that the market value of such timber as that cut, at the time it was cut, was $2.50 per thousand.

"(37) I find that the other bearing trees called for at the southwest corner of the Sims, if placed at the course and distance from the corner called for in the field notes from the southeast corner located by plaintiffs, would now be in the creek, but I find that the evidence shows that the banks of the creek have washed away since said field notes were made, and that said bearing trees could have been, and probably were, located from plaintiff's southwest corner, the course and distance called for in the Sims southwest corner.

"(38) I find the southeast corner of the Sims and the northeast corner of the Linville to have been identical.

"(39) I find that the northwest corner of plaintiff is 4,020 varas south, 80 west, from Big Cow creek, and that the field notes of the Sims call this distance to be 4,050 varas.

"(40) I find that the true north line of the Richard Sims begins at the corner located by the plaintiff as the northwest corner, and runs according to the old marked line, and which I find is shown north 80 degrees ——— until it reaches Big Cow creek, after which on this course no marks can be found, but that from the northeast corner to Big Cow creek, striking Big Cow creek above the last-mentioned line is another old line which I find to be the continuation of the original north line.

"(41) I find that the timber cut by the defendants, Boynton Lumber Company and others, was north of this true north line, which is also the south boundary of the Armstrong, and that said timber was in fact located on the Armstrong survey. I find that on the west the timber cut was on the Cochran league, and not on the Sims.

"Conclusion of Law.

"It having been agreed that the plaintiff had title to the Cochran and Armstrong surveys, and the case by the agreement having been made one of boundary merely, I find that plaintiff is entitled to recover the land sued for. I find that plaintiff is entitled to recover for the timber cut at the market value, at the time cut, of stumpage.          A. E. Davis, Judge Presiding."

Applying to these findings the law herein above set out, we are, after a careful consideration of the testimony in this case, of the opinion that the evidence supports the findings of the trial court.

[5] Appellant by his fourth assignment of error attacks the trial court's ninth conclusion of fact—

"because the trial court erred in giving probative force to subdivisions of other surveys as controlling the location of the Sims league, because the Sims league, under the evidence, was located upon the ground definitely, according to its own calls and field notes."

In our view it is not necessary to consider this assignment, because even if the same was error, it was not prejudicial to the appellants, there being sufficient evidence in the record to show the location of the original north and west lines of the Sims survey as they were run by the surveyor originally in locating said survey.

Finding no error in the judgment of the lower court, the judgment is in all things affirmed.

CONLEY, C. J., concurs. BROOKE, J., recused and not sitting.

MIDDLEBROOK, J. (dissenting). The fact that Justice A. G. BROOKE is disqualified in this case makes it more regrettable to the author hereof that he is unable to agree with the majority of the court, as constituted for the determination of this case.

Upon an examination of the statement of facts in this case, the first thing that appears is an agreement between the parties to the cause of action, as follows:

"It is agreed by and between the parties to this cause as follows:

"(1) If the land in controversy is on the Nathaniel H. Cochran league survey in Newton county, Tex., or on the W. C. Armstrong survey in Newton county, Tex., or partly on both, that it belongs to plaintiff in the above-styled and numbered cause, and that in such case the

plaintiff is entitled to recover of all of the parties to this suit the land in controversy, or that if any part of the land in controversy is on the Nathaniel H. Cochran league or on the W. C. Armstrong survey, that the plaintiff herein is entitled to recover such part.

"(2) That if the land in controversy is on the Richard Sims league survey in Newton county, Tex., the defendants herein shall have judgment for such part of the land in controversy as is on said Richard Sims league, and that as to such land plaintiff herein shall take nothing, and that if any part of the land in controversy is on the Richard Sims survey, as to such part plaintiff is not entitled to recover, and that defendant shall have judgment for such part of the land in controversy as is on the Richard Sims league.

"(3) If, under the foregoing, plaintiff herein is entitled to recover any part of the land in controversy, he shall have judgment for such damages, if any, as he may be able to show by the evidence, same to be awarded against the defendant or defendants, if any, causing same, as shown by the evidence.

"(4) If it should be found that there is any conflict between the said Cochran and Armstrong surveys and the Sims survey, either or both, affecting the land in controversy, the right to the part of the land in controversy in conflict, if any, shall be determined by the principles of law applicable to the priority of said surveys, subject to the foregoing terms of this agreement."

In the latter part of the first paragraph of the majority opinion, my Brethren use the following language:

"The matters at issue in this cause can and should be classified as follows:

"First. The location of the boundary line between the W. C. Armstrong survey and the Richard Sims league.

"Second. The boundary line between the south part of the N. H. Cochran survey and the said Richard Sims league, the appellee owning the Armstrong and Cochran surveys and the appellants that portion of the Sims survey not in conflict with the Armstrong and Cochran surveys."

It is the opinion of the writer that the law would determine the rights of the parties under the rule of major and minor, or older and younger, surveys, regardless of the statement quoted above in the majority opinion; but, it being couched in the language that it is, he has deemed it not unwise to copy in this opinion the agreement of the parties to this suit, showing by the terms of the agreement that the older survey will take precedence over the junior survey, and that in any conflict as to the boundaries of the Armstrong survey and the Richard Sims league, and the Cochran survey and the Richard Sims league, the Richard Sims league, being the older, would have precedence over the other two surveys.

In boundary suits, the writer hereof understands that there are three controlling principles that should govern in fixing boundaries in dispute, and they take precedence in the order herein stated: First, calls for natural objects; second, calls for artificial objects; and third, calls for course and distance. So, if the evidence of this case shows natural objects on the ground, such as witness trees, creeks, mounds, sloughs, etc., identified by the field notes of the original patent still on the lines and at the corners, as called for in the original patent, artificial objects and course and distance, of necessity, must give way to such natural objects marking the footsteps of the surveyor who made the original field notes. If such natural objects cannot be found upon the lines and at the corners, as called for by the original field notes, and artificial objects, such as stakes and artificial mounds, are found on the lines and at the corners as called for by the field notes of the original patent, then these would govern, and the survey would be so constructed. But if neither natural objects nor artificial objects can be found, so marking such lines and corners, then, as a principle of law, the third principle would be the guide by which to determine where the land actually lay; that is to say, having a known corner, the survey would be constructed by course and distance, as designated in the original field notes in the patent.

In the case under consideration, there is no question about the northeast corner of the Richard Sims league; all parties agree as to the location of this corner, and agree that the original witness trees at this corner are still standing. It is also agreed, by every witness who testified in this case, that a well-marked line of proper course and distance from the northeast corner of the Richard Sims league, in accordance with the calls in the original patent for the north boundary line of the Richard Sims survey, is on the ground now, out to Cow creek, a distance from said corner of about 840 varas. There seems to be no contention as to the proper south line of the Richard Sims league, except as to its length, and as to where its southeast corner is, and as to where its southwest corner is, one surveyor placing the southeast corner about 368 varas further east than the other, and the same surveyor placing the southwest corner about 408 varas east of the corner as established by the other surveyor.

It will not be out of place to state here that, after a careful reading of all of the evidence in this case, the writer is of the opinion that the appellant has advantage of, at least, two of the controlling and directory principles of law governing the fixing of the boundary lines of disputed surveys, to wit, natural objects, and course and distance.

The majority opinion quotes the entire 41 findings of fact, as filed by the trial court, as a basis for the facts governing the opinion of affirmance in this case. The findings of fact, as filed by the trial court, are so drastically called in question by appellant's counsel, both in his original brief and more especially in the motion for rehearing in this cause, it is deemed not only not unwise to here quote from the statements of facts adduced upon the trial of the cause, but necessary and proper to do so.

In the third finding of fact, the trial court says:

"I find that the plat introduced in evidence by the defendants made by the witness R. W. Priest correctly shows the work done by him on the ground, and shows the relative position of the west boundary line of the Sims, and I find that at the corner treated by the witnesses for plaintiff as the southwest corner of the Richard Sims (the true southwest corner of the Richard Sims being the beginning corner of said Sims), there is now standing, at the proper course and distance, a magnolia tree, a block from which was cut out and introduced in evidence in this case and showed, judging the diameter from the block, to have been about 12 or 14 inches in diameter. Said block itself appears to have been cut out to a depth of about one-third of the diameter of said tree, and said block itself showed about 50 rings, and showed to be old enough for the original bearing tree; but no marks were shown to have been upon it."

A diligent search and consideration of the statement of facts filed failed to show the introduction in evidence of any such block from any such tree. There is much testimony about cutting a block from such a tree, some of the witnesses testifying that the tree was cut down and a block taken from it; some of them testifying that a small chip was cut out of the tree, so as to cut out certain marks or letters on the tree, and upon the line as run by Mr. McMahon from what he designated as the southwest corner of the Richard Sims league (the magnolia tree from which the block seems to have been taken, considered by him to be a marking tree for that corner, although he admitted that it was a small tree for such corner, and that it had no marks on it that he recollected), northwardly from said corner, a number of blocks were cut out of trees along that line to test the age of that line, and it shows by all of the witnesses that that line could not have been run more than 50 years ago. Again, there is testimony as to blocks cut out of trees on the east boundary line, as traversed by Priest, which shows that line to have been run 70 to 72 years ago. These facts seem to be undisputed in the record, but no witness testified as to such block having been cut out of a magnolia tree at the southwest corner, as claimed by the McMahon survey, about one-third of the diameter of the tree, and that the block showed about 50 rings, and showed to be old enough for the original bearing tree, nor is any such block made a part of this record, nor does the statement of facts show that such block was introduced in evidence. On this point, Mr. McMahon, one of appellee's surveyors, testified:

"At the southwest corner of the Sims and northwest corner of the Linville, the magnolia as called for in the original field notes of the Linville and of the Sims is standing. I found a magnolia there marked that fit the course and distance for that tree, and the distance called for in the Sims in going north 80 east on the south boundary called for creek at 100 varas, and I found that distance hits the creek all right, as called for in the original field notes. My recollection is that there were some letters on the magnolia. This don't show, but it strikes me there were some letters on the tree. I am not sure what they were. My field book would show, I suppose. From that point I ran

a trial line north 10 west. * * * The Sims calls to run north 10 west from that point to a point opposite the southeast corner of the Cochran, N. H. Cochran. I found that the calls north 10 west wouldn't trace the line found on the ground. I ran to the right of the line, to the east. When I ran north 10 west from this point it brought me out east of this point. So, I checked on that and took the course that that would trace it, which is north 12 degrees 45 minutes west. * * * This line is a marked line, hacked and blazed, and there is some corners along on this line, the divisions, the Lewis on this side and the Sims on this side. It seems to be an old line. I remember finding different ages in marks along the line. It was run more than one time. I found after I got to the southeast corner of the Cochran, in order to trace the old line on the ground, I have to change that course from north 12 degrees 45 minutes west to north 10 degrees 50 minutes west, to trace the line on the ground. * * * We found marks on the west line. We cut into several trees along there. The way to tell the age of a mark is by cutting into the tree. * * * It is regarded by surveyors as an absolutely certain way. I don't remember what we agreed upon about how old the line was, but we chopped into some timber, and Mr. Priest counted the rings, and so did I. I counted on more than one tree. We found one tree, a beech tree that we took to be 50 years old. I don't remember that it was the oldest. Probably it was as old as any we cut out. Mr. Priest didn't show me a single mark which would show the line to be 72 years old. I didn't consider one tree; I didn't place a great deal of importance on that being a marked line. This survey of the Sims was about in about 1834. That line, that is as old a line as there is in the woods anywhere."

On cross-examination, Mr. McMahon testified as to the magnolia tree that he claimed to be the southwest corner of the Sims league, as follows:

"I don't remember any discussion with Mr. Priest about that magnolia tree. I didn't admit that it couldn't have been the tree called for by the field notes, while it is possible that it could have been another tree that stood near there. It wasn't my opinion that it couldn't have been the tree called for. I have always thought that was the corner, that tree. That it was the tree called for in the original patent. The correctness of my work is not necessarily based on that being the tree called for in the patent. I carried Mr. Priest down there because he wanted to go down there. I don't know whether I could ascertain the age of a tree or not, I have never had any experience along that line. We cut out those letters that was on the tree is my recollection. I never bothered the marks until Mr. Priest was there with me. We didn't determine anything by chopping it out. It didn't prove a thing. We just took a small chip out about the width of the letters. My recollection is these letters must have been M. B. It strikes me it was; I am not sure that it wasn't the initials of the Sims. I wouldn't undertake to say how old they were. According to my opinion, that was the original bearing tree called for in the field notes. I wouldn't say straight out if it hadn't been at the distance called for. If it was the tree called for in the field notes it didn't grow much. I said it wasn't more than 12 or 14 inches in diameter. It was a small tree, though. I don't know how much a magnolia would grow in 70 years."

(The testimony quoted above will be found on pages 2 to 16 of the statement of facts.)

Again, on page 61 of the statement of

facts, Mr. McMahon, testifying on cross-examination, said:

"On the west line we chopped out some trees. Mr. Priest was chopping this out and showing me, and I wanted to know. I had no experience in counting rings at that time. I came back to accommodate the Boynton Lumber Company. They asked me to. We didn't discover anything on that line over 50 years old."

It will be observed by the testimony of appellees' surveyor, as quoted above, that while he first stated that he found the original tree marking the southwest corner of the Sims, yet, finally tested, his testimony is that it was not marked as the field notes called for it to be marked; that it did not prove anything, and, again, that the line he ran from that point northwardly to find the northwest corner of the Sims league was not run in accordance with the field notes, and the line he found did not fit the field notes of the Sims league, and, instead of being a straight, continuous line between the southwest corner of the Sims and the northwest corner of the Sims, that it was a broken line running from his supposed southwest corner north 12 degrees 45 minutes west, instead of north 10 degrees west, as called for in the original field notes, and he runs on such angle, making a corner that is not called for in the original field notes, on what he claims to be the west boundary line of the Sims league, and from that corner he runs north 10 degrees 50 minutes west, in order to trace the line he claims to be the original west boundary line of the Sims league to what he claims to be the northwest corner of the Sims league. It is to be noted that the magnolia tree he claims to be a marker of the southwest corner of the Sims league is only 12 or 14 inches in diameter at this time, and 70 odd years ago the original field notes called for a magnolia tree 10 inches in diameter. The original field notes call for the magnolia tree marked as a witness tree. There is no testimony or contention in the statement of facts that the magnolia tree McMahon claims for the southwest corner of the Sims has any such marking. It is certain, therefore, that the magnolia tree he claims cannot be the tree mentioned by the original surveyor of the Sims league. Again he says the test they made for testing the age of the west boundary line, as he claims it to be, showed that line to be not more than 50 years old. If that line is not more that 50 years old, it cannot be the line run by the original surveyor of the Sims league in June, 1835, and therefore McMahon, according to his own testimony, did not trace the footsteps of the surveyor who originally surveyed the Sims league, but, on the contrary, he traced another and a different line, run at least 20 years after the Sims league was surveyed, and therefore, by his own testimony as to corner, course, and distance, and age of the line, he proves conclusively that the line he claims as the west boundary line of the Sims league

is not the line as established by the surveyor in 1835. It is to be noted also, that the evidence is silent as to the witness trees on this west line, out of which they cut chips to test the age, being trees mentioned in the original field notes.

R. W. Priest, appellant's surveyor, on page 39 of the statement of facts, testified:

"We traced the south line through, and my 5,000 varas carried me across as shown on that plat to within 25 varas of a large magnolia tree, standing 2½ or 3 feet in diameter at the corner I established as the southwest corner of the Sims. That would be 25 varas over the distance. It is an old scarred tree. I couldn't detect any marks on it. It is a very large tree, one of those old fellows. There seemed to be some scars on it; whether they were blazes or scars I couldn't tell you. Fitting that tree as a bearing tree, I found two or three blazes going north 10 west from there. I traced that line up, and there is a red oak across the west line of the survey. I ran up there to that tree, which would put me about the same as that gum tree I described awhile ago, being marked on the west line 20 varas west of me. (The testimony as to the gum tree will be found on page 37 of the statement of facts.) That is about in line with the magnolia. When I ran south to this fence from the southwest corner of the north half, I was about 20 varas east of this gum tree that I found with the marks on it. I did not cut into those trees. The blazes on those trees were very old. We cut out blocks along the line claimed by plaintiffs as the west boundary line. I counted 45 or 46, and he could get 50. We had a laugh over it, and I told him we wanted a line 25 years older than that. That was the west boundary line as claimed by plaintiffs. When we started off the first call we came across was the magnolia on the bank of the creek. Mr. McMahon was with me, and he told me the magnolia tree was standing there, and there was an old marked line from there going out north. We went there, and at the crossing of the creek, he says that corner is right over in there, pointing north from the way we were going, and when we got out there somewhere I says, 'Mr. McMahon, where is that tree, I want the magnolia.' He says, 'There it is,' and pointed to a tree 10 or 12 inches in diameter. I said: 'You don't think that tree is 75 years old, that small magnolia tree, thrifty looking tree? You are too good a surveyor to tell an old man like me that tree is 75 years old.' He said: 'I always had my doubts about that magnolia tree. I will show you the old line all right.' So we ran right up the line, right up the creek. I said, 'It is very strange that they would put the corner right on the bank of the creek and run down the creek both ways without calling for that creek anywhere.' We cut out the first old tree we came to, and made our count, and then we cut out two more of them and counted them, and he said the line, he didn't think, would exceed 50 years old. I said we would agree that it was 50 years old. The line didn't run with the compass, and when we got to this corner between the Cochran and the survey south of the Cochran line, he changed his veniere plate to follow it up to the corner. It ran at a different angle, showing that it was not a straight continuous line from one corner to the other, that should be one continuous line. Running south from what I established as the southwest corner of the Sims, I found one blaze about like this up there. I didn't cut it out, and don't know how old it was. In running the Linville they start at a point south 80 degrees west from the creek. If you were 8 or 10 varas south of the original line as run by them, you would cross the creek maybe 500 varas from where I establish as the

southwest corner, and if you were 8 or 10 varas north of that, you would cross the creek in the neighborhood of 100 varas. The corner where Mr. McMahon showed me is now in the creek. * * * The Linville doesn't begin at the southwest corner of the Sims. That is about the sixth or seventh corner of the Linville. The Linville northwest corner is the beginning corner of the Sims, the Sims being a junior survey. * * * The magnolia tree standing on the bank of Cow creek on the line established by Mr. McMahon is a thrifty looking magnolia, and looked like about 10 or 12 inches in diameter, not over that. I don't think it was 75 years old. The magnolia I use as a beginning corner could have been there then. That tree is apparently old enough to have been the original tree called for. * * * The location of that tree would justify my belief that it is the original tree called for. I had only 25 varas excess to get to it. That is a very small excess in a 5,000 vara line. The blazed trees both north and south of the magnolia tree found by me show to be on a line with that."

Priest's testimony is unequivocal. His work is in accordance with the field notes, as called for in the original patent. The other surveyors admit that their work is not in accordance with the original field notes. Priest finds evidence by natural objects, the gum tree and the red oak tree, for the establishment of his west line, added to his correct work as to course and distance. McMahon and the other surveyors testifying find what they claim to be evidence of natural objects marking the west line, but, when tested by rules governing surveyors as to age of lines, prove conclusively that their west line cannot be the original west line.

The Sims league, as shown by the patent, is a parallelogram 5,000 varas length on each side. Hence the south boundary line of the Sims is 5,000 varas long. The Linville league, by its field notes, has seven corners, and the north boundary line of the Linville league is the south boundary line of the Sims league, so far as it extends, but the north boundary line of the Linville league is only 4,860 varas long, as shown by the field notes and testimony of the witnesses. It, therefore, is a mathematical impossibility for the north boundary line of the Linville league to be the entire south boundary line of the Sims league, because the Sims south boundary line is 5,000 varas long. Suffice it to say here that the witnesses finally agree as to the southeast corner of the Sims league on the Linville northeast corner. As we read the testimony, they also agree as to Priest having found the original east boundary line of the Sims league from the agreed northeast corner of the Sims league to the southeast corner of same. This being so, there is virtually an agreed southeast corner, and, this being true, it follows that the south boundary line of the Sims league must pass beyond 4,860 varas, the approximate point of appellee's southwest corner of the Sims league. If McMahon had found a corner tree for the southwest corner of the Sims, where he claims that corner to be, and then found a line which, under test, showed to be

a line old enough for the original west line of the Sims, some credence might be given to his claim, but when he admits that the corner, as placed by him, is 140 varas east of where the corner should be by a correct measurement, and, again, when he admits that the line he claims to be the west line is at least 20 years too young for the original line, and yet again, when he admits that the west line, as claimed by him, is a broken line, putting an extra corner in the Sims league not called for in its field notes, and run by a different variation (each end of his broken line) from any variation called for in the original patent for the west boundary line of the Sims, it occurs to the writer that he admits that the line he claims is not the line as run by the original surveyor; and, again, when he crosses Cow creek six times in tracing this line, without a single call for Cow creek, it occurs to the writer that he fails upon the establishment of his line from every legal standpoint, natural objects, artificial objects, and course and distance.

On the other hand, Priest says that he ran the proper course and the proper distance to find the southwest corner of the Sims league, and 25 varas beyond the place where he should have found the Sims southwest corner at the end of 5,000 varas, he found a magnolia tree 2½ to 3 feet in diameter, marked and scarred, an old tree, but he could not say that it had axe marks as a witness tree, but that it was a tree old enough to have been there, and to have been the tree mentioned in the original field notes, and, again, going north 10 degrees west, as the original field notes called for the west line to go, he found some blazes, very old, and especially does he testify as to an old gum and a red oak marked and standing about 20 varas west from the line he ran as the west boundary line, and that these trees were on line with the magnolia tree he spoke of as being 25 varas from the point he measured to, as the south boundary line of the Sims.

A witness by the name of Singleterry, who had lived in the section of this line since 1880, said that he was with Mr. Woods (the surveyor who made the map forming a part of the majority opinion in this case), when he surveyed the west line of the north half of the Sims league, and that the line run by him and Woods was about where Priest established the west boundary line of the Sims; that they did not find the southwest corner because there was an old field there; said that they did trace the west line, and that Woods said it was the correct line, and that that line Woods said was the correct line was about a quarter of a mile west of where McMahon claims the west line to be.

J. K. Wilson, plaintiff's witness, page 91, statement of facts, testified:

"We went to the northwest corner of the Priest line. We found some stump holes. It didn't seem to satisfy them, the best I recollect. There was signs from this old corner

down there to where that corner was, and we just followed the surveyor with the chain. They were new marks. I suppose Pope tried to identify that corner; he wasn't satisfied. I heard him complain about it. In running the old one, he said, 'this fits up all right.'"

Priest says, page 47, statement of facts: "At my northwest corner I found only a stake and stump hole."

On page 34 he says: "I have made a thorough survey of this league (the Sims league). I made this map. It is a correct map of outside boundaries. It exactly shows the work done by me on the ground. (Here the map was offered in evidence, from which the plat or map hereinafter mentioned is made, and the one here attached as a part of this opinion is an exact reproduction of the original map introduced, only on a smaller scale, furnished for me through the kindness of Mr. George White, county surveyor of Jefferson county, Tex.) When I first went down there, I went from the northwest corner, and there is an old gentleman by the name of Lewis, Mr. Martin Lewis, who showed me the place where the two black lines cross here, as being the northwest corner of the league. That is the corner established by me. There is a stake there, and he showed me an old stump hole, where he said the tree was destroyed. Some one else informed me there was another corner, which is the corner claimed by plaintiff."

Thus we have testimony of different witnesses substantiating the correct placing of the northwest corner of the Sims league by Mr. Priest.

There is no question as to the northeast corner of the Sims league. All parties agree also as to the correctness of the line from the northeast corner of the Sims league westward to Cow creek, the line being reasonably marked up to Cow creek. The Priest north boundary line of the Sims is a continuous line running the proper course and the approximate distance to where he contends the northwest corner of the Sims league to be. The McMahon line is not a continuous line from the northeast corner, but at Cow creek there is an offset of 80 varas, a direct disputation of the original field notes. The northwest corner, as established by McMahon, is short of distance, and by his own admissions, at least 20 years too young for the original survey, and cannot be reached by running the course called for in the original patent from the agreed northeast corner, but, on the contrary, would be out of line. It is true the trial court found, as a matter of fact, that there was a post oak tree at the northwest corner, as established by McMahon, but the undisputed evidence shows that post oak tree about 5 or 6 inches in diameter, and McMahon himself says he wouldn't say that was the original corner tree, and the trial court claims only that it could be made to fit very well. Old citizens, witnesses for both the plaintiff and defendant, testify as to the stump hole at the Priest northwest corner, and one of them, who originally showed Priest the northwest corner some 16 years ago, told Priest that where the stump hole was was the original witness tree of that corner.

A careful perusal of the testimony in the case shows conclusively, appellee's witnesses themselves finally so admitting, that the line run by Priest as the east boundary line of the Sims is the original east boundary line called for in the field notes of the Sims survey. Priest testifies unequivocally as to the marking of this line by different kinds of natural objects, and that he cut blocks out of the marked trees on this line, and that they showed the line to be 70 to 72 years old. He also found the corner, according to his testimony, which is practically admitted by appellee's witnesses, called for in the original field notes of the Sims league as the southeast corner of the Sims league. The testimony on this line is exhaustive, but we deem it unnecessary to quote it directly.

The plat filed herewith, a copy of the original Priest map on a smaller scale, and made a part of this opinion, shows all of the different lines testified about by the witnesses both for the plaintiff and the defendant, and shows clearly the incongruities and patent errors of the lines claimed to be the boundary lines by appellees, as well as the lines claimed by the surveyor, Priest, to be the correct lines of the Sims league.

There is a maze of testimony in the statement of facts as to the surveys which have nothing to do with the fixing of the boundary lines of the Richard Sims league, and is not necessary to be discussed, and as we view the case, many of the findings of fact of the trial court are absolutely superfluous, being based upon such testimony, for:

"It is only in the absence of other means of identification that known calls in other surveys can be appealed to, to locate a tract of land, as the true course of a survey, or line, or corner, should be determined by finding the lines and corners actually made on the ground by the surveyor." Lafferty v. Stevenson, 135 S. W. 216; Taft v. Ward, 58 Tex. Civ. App. 259, 124 S. W. 437.

Again:

"There is no rule by which junior surveys can control or even have any effect upon the location of a senior survey." Ewell v. Hauser, 140 Ky. 459, 131 S. W. 186.

And again:

"A survey takes its position on the ground according to its own field notes, uncontrolled by the calls in the field notes of junior adjoining surveys." Williams v. McLeroy, 135 S. W. 251.

Appellant in his motion for rehearing also cites Anderson v. Stamps, 19 Tex. 460; Hamilton v. Blackburn, 43 Tex. Civ. App. 153, 95 S. W. 1094; State v. Sulflow, 60 Tex. Civ. App. 615, 128 S. W. 652; Ramseaur v. Ball, 59 Tex. Civ. App. 285, 125 S. W. 590; Polk County v. Stevens, 143 S. W. 206.

The syllabi quoted by appellant's counsel from these authorities we believe are correct propositions of law. We have not read all of the cases, nor have we proved the citations, except as to those quoted from; but the writer hereof believes that two of the

three controlling principles in fixing the boundaries of a survey of land under the laws of Texas have been met by the appellants in this case, to wit: First, by natural objects; and second, from a known agreed corner, by course and distance. He thinks, also, that there is sufficient agreed testimony on the one hand and undisputed testimony on the other to show conclusively, by a great preponderance of the testimony, that the Richard Sims league was located upon the face of the earth by the original surveyor substantially as the surveyor Priest located it, and, such being true, the appellants should have recovered in this case, and therefore it is his further opinion that the judgment of the trial court should be reversed, and judgment should have been rendered in this court in favor of the appellants.

## On Rehearing.

CONLEY, C. J. The motion for rehearing in this cause was overruled on the 6th day of October, 1916. Thereafter the appellants filed a motion to vacate the judgment in this cause, and to certify the case to the Supreme Court, and the court then, of its own motion, and that it might have opportunity to investigate the questions presented in the latter motion, recalled its action in overruling the motion for rehearing. The motion to vacate the judgment is based upon the proposition that Special Associate Justice Duffie was not legally appointed, and for that reason the judgment of affirmance rendered in this cause in the original opinion was thereby wholly void, as Justice Brooke was disqualified, and as Justice Middlebrook dissented from the affirmance of the cause by Justice Duffie and Chief Justice Conley.

[6] When this cause was presented to the court originally, it was ascertained that Justice Brooke was recused. Associate Justice Middlebrook and Chief Justice Conley considered the cause, and could not agree as to its disposition. Thereafter a certificate to that effect, in accordance with the terms of the statute, was made and filed with the Governor, who thereupon appointed M. S. Duffie as Special Associate Justice to sit in said cause, and he thereupon duly qualified. The court being thus constituted, it again took up the consideration of the cause, and Chief Justice Conley agreed with Special Associate Justice Duffie in the majority opinion, Justice Middlebrook dissenting. We are of the opinion that there is no merit in appellants' contention that the court, as thus constituted, was an illegal entity. The Constitution of 1876, art. 5, § 11, on the question of the disqualification of appellate judges, provided:

"No judge shall sit in any case wherein he may be interested, or where either of the parties may be connected with him by affinity or consanguinity, within such degree as may be prescribed by law, or where he shall have been counsel in the case. When the Supreme Court or the appellate court, or any two of the members of either, shall be thus disqualified to hear and determine any case or cases in said court, the same shall be certified to the Governor of the state, who shall immediately commission a requisite number of persons learned in the law, for the trial and determination of said cause or causes."

Following this constitutional provision, Revised Statutes of 1879, art. 1040, which article was originally passed May 12, 1846, and readopted in 1879, provides as follows:

"No judge of the Supreme Court or Court of Appeals shall sit in any cause wherein he may be interested in the question to be determined, or where either of the parties may be connected with him by affinity or consanguinity, within the third degree, or where he shall have been of counsel in the cause; and when either court or any two of its members, shall be thus disqualified to hear and determine any cause or causes in said court, the same shall be certified to the Governor, who shall immediately commission the requisite number of persons, learned in the law, for the trial and determination of said case or cases."

Article 5, § 11, of the Constitution of 1876 was amended on September 22, 1891, and now reads as follows:

"No judge shall sit in any case wherein he may be interested, or where either of the parties may be connected with him, either by affinity or consanguinity, within such a degree as may be prescribed by law, or when he shall have been counsel in the case. When the Supreme Court, the Court of Criminal Appeals, the Court of Civil Appeals, or any member of either, shall be thus disqualified to hear and determine any case or cases in said court, the same shall be certified to the Governor of this state, who shall immediately commission the requisite number of persons learned in the law, for the trial and determination of such cause or causes."

Section 27 of the Acts of the Special Session of the Twenty-Second Legislature, in the year 1892 (Gammell's Laws of Texas, vol. 10, p. 30), providing for the creation of Courts of Civil Appeals, and which act is carried into the present Vernon's Sayles' Revised Statutes as article No. 1584, provides as follows:

"No judge of the Court of Civil Appeals shall sit in any cause wherein he may be interested in the cause to be determined, or where either of the parties may be connected with him by affinity or consanguinity within the third degree, or where he shall have been of counsel in the cause; and when the court, or any two of its members shall be thus disqualified to hear and determine any cause or causes in said court, that fact shall be certified to the Governor, who shall immediately commission the requisite number of persons, learned in the law for the trial and determination of said cause or causes."

It is to be seen that inadvertently this act followed the language of the Constitution of 1876, and the statute passed thereunder, instead of harmonizing with the provisions of the amendment of 1891, and the act is, to that extent, in conflict with the Constitution. The Constitution makes it the duty of the Governor to appoint a Special Associate Justice when any member of the Court of Civil Appeals is disqualified, while the statute says that the Governor may appoint only when the court or two members thereof are dis-

qualified. This conflict, of course, must be resolved in favor of the Constitution. In the case of City of Austin v. Nalle, 85 Tex. 539, 22 S. W. 668, 960, the court had occasion to consider a question with reference to the power of the Governor to make appointments in Courts of Civil Appeals in case of disqualification of a judge or judges, and said:

"Under the original section a special judge could be appointed only when two members of a court were disqualified; and hence there was no provision to meet the case when one was disqualified and the other two failed to concur as to the decision of the case. The amended section obviates this difficulty by providing for an appointment when only one is disqualified."

This section of the Constitution is self-executing, in that it contains within itself the means by which the right given may be enjoyed and protected, and the duty imposed enforced. Cooley, Const. Lim. (6th Ed.) p. 99. Under the above authorities, there can be no question but what Special Associate Justice Duffie was legally appointed by the Governor to sit in this cause, and that the court, as thus composed, was a duly and legally constituted court.

[7] There is also no merit in appellants' contention to the effect, that it is incumbent on this court, because of the dissent of Justice Middlebrook, to certify this cause to the Supreme Court. The original opinion of the court shows the sole question for determination involved the location of boundary lines between lands owned by appellants and other lands owned by appellee. Therefore the case is one of boundary only, and one of which this court has final jurisdiction under the law. Article 1620, Vernon's Sayles' Texas Civil Statutes, provides:

"When any one of said Courts of Civil Appeals shall, in any cause or proceeding, render a decision in which any one of the judges therein sitting shall dissent as to any conclusions of law material to the decision of the case, said judge shall enter the grounds of his dissent of record; and the said Court of Civil Appeals shall, upon motion of the party to the cause, or on its own motion, certify the point or points of dissent to the Supreme Court."

This statute, it has been determined, does not apply to causes of which the Courts of Civil Appeals have final jurisdiction. Kidd v. Rainey, 95 Tex. 556, 68 S. W. 507; Miller v. Mosely, 91 S. W. 651; Herf v. James, 86 Tex. 230, 24 S. W. 396.

[8] Appellant also contends that it was entitled to have this case orally reargued after Justice Duffie was appointed. We do not think so. The case was regularly set on the docket for submission, and was, on the day of its submission, orally presented to the court. The presentation of any further oral argument was a matter of grace or invitation from the court, and the court not deeming the issues involved in the case of sufficient importance, or of such a nature as to require further elucidation than was obtained from appellants' arguments in the briefs, did not extend an invitation for any further oral presentation, and did not think any necessary.

Motion for rehearing, and also motion to vacate and certify overruled.

DUFFIE, J., concurs herein.