STATE OF TEXAS v. W. H. SULFLOW ET AL.

Decided May 4, 1910.

**1.—Survey—Boundaries—Conflicting Calls—Course and Distance—Unmarked Line.**

Rules as to comparative dignity and effect of conflicting calls in field notes in determining the location of land reviewed and discussed, and held not absolute in their application.

**2.—Same.**

The object of the rules as to comparative dignity of calls in a survey is the identification of the actual lines run by the surveyor, and a call for an unmarked line in the prairie of older surveys may prevail over calls for course and distance where there is evidence showing the former to be more likely to be correct.

**3.—Same.**

Evidence in regard to the location of a block of surveys considered and held to support the finding that no vacancy existed between such land and boundaries of older surveys called for in the field notes, though the latter were unmarked lines in a· country devoid of natural landmarks, and course and distance must be disregarded in order that the surveys be made to connect, there being evidence that the older line called for was actually run out by the surveyor and ascertained.

Appeal from the District Court of Travis County. Tried below before Hon. Chas. A. Wilcox.

*Jewell P. Lightfoot,* Attorney-General, *Jas. D. Walthall,* Assistant, and *Geo. E. Shelley,* for appellant.—The evidence showed clearly that the surveying of said sections, if actually done at all, was done from Coyote Lake to the north, and any calls for the south line of the Capitol leagues were made either through mistake, or at random, or through fraudulent attempt to appropriate more land than was purchased and paid for by the locators.

Footsteps of the surveyor must be followed: Oliver v. Mahoney, 61 Texas, 612; Williams v. Winslow, 84 Texas, 371; Scott v. Pettigrew, 77 Texas, 328.

Construction against party claiming under uncertain surveys should prevail: Phillips v. Ayres, 45 Texas, 607; Schaeffer v. Berry, 62 Texas, 714.

Where calls are taken from field notes of an actual survey, call for distance will control call for an unmarked line where the circumstances tend to show the latter was a mistake: Gerald v. Freeman, 68 Texas, 201; McCown v. Hill, 26 Texas, 361; Ware v. McQuinn, 26 S. W., 126; Robertson v. Doss, 53 Texas, 506; Jones v. Leith, 32 Texas, 330; Clark v. Hill, 67 Texas, 152; Burnett v. Burris, 39 Texas, 504.

Where calls are evidently the result of mistake, same will be disregarded, and effect given to those which are certain and found on the ground: Boon v. Hunter, 62 Texas, 588; Robertson v. Mooney, 21 S. W. Rep., 143; Jones v. Andrews, 62 Texas, 660; Lilly v. Blum, 70 Texas, 711; Koeniger v. Niles, 67 Texas, 123.

Authorities generally bearing upon this case in some of its aspects: Stafford v. King, 30 Texas, 271; Welder v. Carroll, 29 Texas, 329; Booth v. Strippleman, 26 Texas, 442; Bigham v. McDowell, 69 Texas, 102; Harrell v. Morris, 5 S. W. Rep., 626; Boon v. Hunter, 62 Texas, 588; Scott v. Pettigrew, 72 Texas, 328; Aransas Pass Colonization Co. v. Flippen, 29 S. W., 813; Robertson v. Mooney, 21 S. W., 143; Texas & P. Ry. v. Thompson, 65 Texas, 192; Lilly v. Blum, 70 Texas, 710; Sackett v. Scruggs, 73 Texas, 511; Hubert v. Bartlett, 9 Texas, 103; Davidson v. Killen, 68 Texas, 408; Blackwell v. Coleman Co., 94 Texas, 220; Schley v. Blum, 22 S. W. Rep., 264.

*Terry, Cavin & Mills, Cobbs & Cobbs, Stephens & Miller, J. C. Terrell* and *C. K. Bell,* for appellees.—The north lines of said Melvin, Blum & Blum lands and of the Thos. H. Jones, Jr., survey, extend as far north as and are coincident with the south boundary lines of the Capitol leagues immediately north of them. The court did not err in rendering judgment for the appellees. Stafford v. King, 30 Texas, 257; Maddox v. Fenner, 79 Texas, 291; Ridgell v. Atherton, 107 S. W., 129; Smith v. Leach, 70 Texas, 495; Gerald v. Freeman, 68 Texas, 206; Wyatt v. Foster & Rafferty, 79 Texas, 413; Lewright v. Travis County, 118 S. W., 725; Stuart v. Coleman County, 65 S. W., 384; Stuart v. Coleman County, 95 Texas, 446.

JENKINS, Associate Justice.—In 1882 Melvin, Blum & Blum made application under what is known as the Fifty-cent Act (special session 29th Leg., p. 48) to purchase 289 sections of land in Bailey County, Texas, describing each section separately. Section one is described in said application as beginning nine miles west of the southeast corner of Capitol league No. 638, thence east, south, west and north 1900 vrs. Each succeeding section calls to begin on the one next preceding it in numerical order, and is described as being 1900 varas square. The sections are numbered from west to east. Taken together, these sections make a body of land in the shape of a parallelogram, except there is an offset of two miles on the west line, and

it is fifteen miles from west to east on the north boundary, seventeen miles from west to east on the south boundary, and twenty-three miles from north to south. A strip about seven miles wide on the western part of these surveys was found to be in New Mexico. The body of land is subdivided into blocks A, B, C, D, E and F, which subdivisions may be ignored in so far as the matter in controversy in this suit is concerned, and the entire tract be treated as the Melvin & Blum survey. The field notes of said survey call for the north tier of sections to lie on the south boundary lines of Capitol leagues Nos. 628; 629 and 630, and the south tier to lie on the north boundary lines of school leagues 142, 143, 161 and 162. There is no dispute as to the location of the lines of these leagues. The undisputed evidence shows that the distance between the north lines of the school leagues and the south lines of the Capitol leagues is 1155 varas more than the aggregate distance called for in the field notes of the Melvin & Blum surveys. The State claims that this excess is a vacancy lying between the north boundary of said Melvin & Blum surveys and the south line of said Capitol surveys. The appellees deny that any vacancy exists, but claim that the excess is included in and covered by said Melvin & Blum surveys.

In the trial in the court below a jury was waived, and the court found that no vacancy existed, and rendered judgment in favor of the defendants, the appellees in this court.

These surveys are located on a treeless plain where there is neither stream nor mountain. The original corners were made by throwing up mounds made from earth taken from three pits adjoining such mounds, all of which have long since disappeared. Disregarding the calls for the lines of the older surveys, not one of these 189 sections can be located by any object, natural or artificial, called for in its field notes, except about four sections bordering on and covering Coyote Lake and several sections bordering on and covering Monument Lake. These lakes are on the western boundary of the Melvin & Blum surveys, and are called for in the field notes, by means of which the sections covering and bordering on them can be identified and their lines and corners located. The evidence shows that the surveyor who located the Melvin & Blum sections actually found the north line of the school leagues and made the corners of the southern tier of said sections on said lines. It also shows that, beginning on the southern tier of said sections as thus located, and running them out to the north by their courses and distances, the sections calling for said lakes will be properly located. This being true, there is no uncertainty as to the location of any of the sections from the south line up to and including the northern tier of the sections in which Coyote Lake is situated, which is the seventh tier south of the northern boundary of the Melvin & Blum surveys. The contention of the State is that the remaining six tiers should be run out north from Coyote Lake, giving to each its course and distance, disregarding the call for the south boundary lines of the Capitol surveys. If so located, there would be a vacancy of 1155 varas in width between the Melvin & Blum surveys and the Capitol leagues.

If we had no evidence as to how these surveys were actually made,

it would be permissible to begin on the south boundary line and run them out to the north, notwithstanding the fact the field notes call for them to begin on the northern tier, and each tier of sections calls to begin on the tier to the north of it. They were all made at the same time by the same surveyor, and that which is called the beginning section is of no greater importance, by reason of such call, than any other section, for the same reason that that which is designated the beginning corner of a survey is not usually of any more importance in determining the location of a survey than any other corner of such survey.

The State invokes the legal proposition announced in a number of cases, that a call for an unmarked line in a prairie will not control a call for distance. There is no hard and fast rule as to the comparative weight to be given to calls in field notes. The general rule is that priority should be given to calls in field notes in the following order: First, to calls for natural objects; second, to calls for artificial objects; third, to calls for course; fourth, to calls for distance, to which may be added as an corollary to the third and fourth above stated, calls for quantity. These rules are founded in reason and experience. The field notes of a survey are the waybill, directing how the footsteps of the surveyor may be retraced. Where two such directions lead to contrary results, it follows that one of them was inserted by mistake. If it can be ascertained which call is the mistaken one, this is the one that should be rejected. A surveyor is least of all liable to be mistaken in supposing himself to be at a natural object, such as a river, lake, etc. He is less likely to have made a mistake as to having run to an artificial object, such as a marked line or tree, than as to the course or distance traveled in getting to such object. His chainmen are more likely to make a mistake in measuring a line or in keeping account of such measurement than he is in directing his course by his compass. These are the reasons for the general rule as to the comparative dignity of calls, but these rules are intended for one purpose only, and that is to enable us to retrace the lines as actually run by the surveyor by adopting the calls in the field notes which truly describe such lines and rejecting those which were inserted by mistake. But sometimes calls of the highest order are made by mistake, and the circumstances in evidence may show that a call for distance should prevail, even over a call for a natural object. Those calls should control, even though of the lowest rank, which, under all the facts and circumstances in evidence, most clearly indicate the intention of the grant, or which point out with the greatest probability the footsteps of the surveyor. Stafford v. King, 30 Texas, 257; Lilly v. Blum, 70 Texas, 710, 6 S. W., 285; Crawford v. Huff, 89 Texas, 223, 34 S. W., 610.

The reason why a call for an unmarked prairie line will usually not control a call for distance is that, being unmarked, the surveyor probably did not know where such line was, but supposed it to be at the place indicated by his call for distance, and that he actually ran his line the distance called for in his field notes, and called for the unmarked line of the old survey upon the mistaken belief that he had reached it. On the other hand, a call for an unmarked prairie line has sometimes been allowed to control the call for distance, for the

reason that, although the line was invisible, yet its location being easily ascertained by running it out from its other known lines or corners, or from its connecting lines in the vicinity, it is reasonable to suppose that the surveyor ascertained its true location by running it from such connection, and therefore did not make any mistake as to its location, but more probably made a mistake in measuring the distance to such line. In the absence of evidence as to how the Melvin & Blum surveys were made, we might well suppose that the surveyor who located said surveys was mistaken as to the location of the southern boundary of the Capitol leagues, and called for them on the mistaken supposition that they were at the point indicated by his calls for course and distance north of Coyote Lake.

But we are not without evidence as to how these surveys were made upon the ground. They were made by one S. L. Chalk, a deputy surveyor of the Baylor land district, in which Bailey County was then situated. It appears from the undisputed evidence in this case that the northeast corner of Capitol league 633, known as the *sod* house corner, is well established and well known. The map of the Capitol leagues in the Land Office and in the office of the district surveyor at that time showed that the southern block of Capitol leagues did not join the northern block of said leagues, but it showed a connecting line, run from the northeast corner of said league 633 in the southern block of said league, north 18,830 vrs. and east 1,180 vrs. to the northeast corner of league 617, in the northern block of said leagues. The call for the northeast corner of league 617 should have been for the northeast corner of league 618. This mistake was not known when the Melvin & Blum surveys were made. A surveyor with this map in his possession could have begun at any known corner in the southern block of said leagues, and by calculating the course and distance, as shown by said map, could have known what course and distance to run in order to arrive at any corner of any league in the northern block of said league, only when he arrived at said place he would, in fact, be at the corresponding corner of the league next west of the one he would have supposed himself to have arrived at. This, however, would make no difference as to the true location of the north or south boundary lines of said leagues. Chalk testified that he had this map and the field notes of the Capitol leagues in his possession at the time he surveyed the Melvin & Blum sections; that he went to the southwest corner of league 700, which is in the southern block of the Capitol leagues, and which was a well-identified corner at Silver Lake; that he there met a Mr. Moore, the surveyor who was locating, under the supervision of Maj. John Henry Brown, the school leagues for the unorganized county; that he and Moore began at said corner and ran the proper distances west and north for the northwest corner of Capitol league 628 in the northern block of said leagues; that just before arriving at said corner they met a man by the name of Carter, who was holding his cattle at a lake nearby, who showed them what he said was the northwest corner of said league 628; that they finished their surveying, and found the corner shown them to be the correct course and distance from the Silver Lake corner. Chalk says that from this corner he ran south 5,000 vrs., the distance called

for in the field notes for the southwest corner of said league. The applications for the Melvin & Blum surveys directed him to make said surveys along the south boundary of this and the adjoining leagues. This he says he did by making a corner at this southwest corner of league 628, as he supposed, but which, in fact, if he had made no mistake in his measurements, was the southwest corner of league 629, and running from thence east and west along the southern boundary of said leagues, and making a corner every 1,900 varas west to the Texas and Mexico line, and east as far as his surveys extended. If this be true, and the trial court must have so found in order to have rendered judgment for the defendants, the Melvin & Blum surveys were actually located on the ground on and along the southern boundary lines of said Capitol leagues; consequently there can be no vacancy between said Melvin & Blum surveys and said Capitol leagues. There is nothing in the record to call in question the correctness of Chalk's testimony, except the circumstance of the excess in the distance, which is not sufficient to demand or justify a reversal of this case, in the face of the positive and uncontradicted testimony of the surveyor and the judgment of the court below.

Attorneys for the State in their brief call attention to the testimony of the witness Chalk, wherein he says that, after establishing the southwest corner of the Capitol league by measuring 5,000 vrs. south from its northwest corner, found as above indicated, he ran south to a point opposite Coyote Lake, and east to said lake, and made the four corners of the sections bordering on said lake, "and worked from that point north." But this does not prove that he established the north line of his work 1,155 vrs., or any other distance, south of the Capitol league lines. On the contrary he said: "I ran the north line of the Blum's lands exactly with the south lines of the Capitol league lines as established by me, by measuring 5,000 vrs. south from the identified corner, and I ran it both ways, east and west as far as the State line." The only way in which the trial court could have found in favor of the State, in view of this evidence, would have been to have found that the south line of the Capitol leagues *as established by Chalk* was, in fact, 1,155 vrs. south of the true south boundary of said leagues. That is to say, in measuring north for said corner, Chalk and Moore make a mistake, and stopped 1,155 vrs. short of the proper place where said corner was in fact, or that Chalk, in attempting to run south 5,000 vrs. from the true corner, made a mistake and overran his distance 1,155 vrs. Against the first supposition there is the circumstance that the run north was made by both Chalk and Moore, each using his own chain carriers, and it is not at all probable that both sets of chain carriers made the same mistake. There is nothing but conjecture to support the proposition that Chalk made a mistake in running south for the southwest corner of the Capitol league. It is equally as probable that the mistake was made in running south from six to eight miles to the point where he turned west for Coyote Lake. As the corners were all made on the south boundary of the Capitol leagues by running east and west along said lines, Chalk would have completed his work and set up all the corners of his sections without running back to the north boundary of his work, and consequently

would not have discovered his mistake. At any rate, Chalk's testimony is positive that he established the northern boundary of the Melvin & Blum survey by beginning at the northwest corner of the Capitol league, which he says he found by measuring from a known corner of another one of said leagues, and running thence south 5,000 vrs. This testimony being taken as true, there is no difficulty in retracing the footsteps of the surveyor who located these surveys, which is the real enquiry in all boundary suits. Jones v. Andrews, 62 Texas, 661. "The identification of the actual survey as made by the surveyor is the desideratum of all these rules." Stafford v. King, 30 Texas, 273. The footsteps of the surveyor, when found, must be followed. Fagan v. Stoner, 67 Texas, 287, 3 S. W., 44; Blassingame v. Davis, 68 Texas, 597; 5 S. W., 402; Smith v. Leach, 70 Texas, 495; Bolton v. Lann, 16 Texas, 112; Oliver v. Mahoney, 61 Texas, 612; Morgan v. Mowles, 61 S. W., 156.

Finding no error in the judgment of the court below, we affirm the same.

*Affirmed.*