## ROBBS v. WOOLFOLK. (No. 1610.)

(Court of Civil Appeals of Texas. Amarillo. June 2, 1920. Rehearing Denied June 30, 1920.)

1. **Boundaries** ⬅46(5) — **Agreement for resurvey held one of arbitration.**

Agreement of the owners of certain surveys that, in view of doubt and uncertainty as to boundaries, a certain surveyor should resurvey them, and that they should be bound by the result, *held* one of arbitration.

2. **Boundaries** ⬅46(5) — **Arbitration agreement valid.**

An arbitration agreement as to boundaries is valid, and the award subject to impeachment only as in other cases.

3. **Arbitration and award** ⬅82(2)—**Grounds for which only award conforming to submission may be impeached stated.**

If an award conforms to submission, it may be impeached only for fraud, partiality, misconduct, or gross mistake committed on the part of the arbitrator to the manifest injury of the party complaining.

4. **Arbitration and award** ⬅66—**All presumptions in support of award.**

Nothing will be presumed against an award, but every presumption not contradicted by proof will be indulged in favor of it.

5. **Arbitration and award** ⬅76—**Fraud must be pleaded.**

Fraud, to be available against an award, must be pleaded.

6. **Arbitration and award** ⬅64 — **Fraud not sustained by evidence of merit of controversy.**

In the absence of gross and palpable error in award, charges of fraud of arbitrator are not sustained by evidence of the merits of the controversy submitted.

7. **Boundaries** ⬅46(5) — **An agreement held to contemplate that all questions as to application of field notes to facts should be determined by a resurvey.**

An agreement that, in view of doubt and uncertainty as to boundaries, a certain surveyor, after being appointed special surveyor by the commissioner of the general land office, should resurvey and mark on the ground the boundary lines, the parties to be bound by the lines run and surveyed and the corners erected by him, *held* to contemplate that all questions arising in reference to application of the field notes of the original survey to the facts as they existed on the ground should be determined and settled by the surveyor, acting under instructions from the commissioner of the general land office.

8. **Boundaries** ⬅37(5)—**Evidence held not to show mistake by surveyor as to warrant setting aside his award.**

Evidence *held* insufficient to show that the surveyor's decision as to the manner in which the survey should be made was the result of such gross and palpable mistake as to warrant the setting aside of the award under submission to a surveyor.

9. **Boundaries** ⬅3(5)—**Course and distance do not universally prevail over unmarked prairie line.**

The rule that an unmarked prairie line will not prevail over a call for course and distance is not inflexible, but its application depends on the facts and circumstances of each case.

Appeal from District Court, Floyd County; R. C. Joiner, Judge.

Action in trespass to try title and on an agreement for survey by J. T. Robbs against R. N. Woolfolk, to recover certain land. Judgment for defendant, and plaintiff appeals. Affirmed.

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

J. N. Stalbird, of Lockney, A. P. McKinnon and Kenneth Bain, both of Floydada, and H. C. Randolph, of Plainview, for appellant.

Kinder & Russell and Williams & Martin, all of Plainview, for appellee.

BOYCE, J. Prior to the institution of this suit J. T. Robbs, plaintiff in the court below, and R. N. Woolfolk, defendant therein, joined by various other parties, who all together owned more than 60 per cent. of the lands included in block C–9 Gulf, Colorado & Santa Fé Railway Company, in Floyd county, entered into a written agreement in part as follows:

"Know all men by these presents, that whereas, we who have signed our names hereto are the owners of tracts and parcels of surveys Nos. 1 to 20, inclusive, all in block C–9, and comprising the whole of block C–9, in Floyd county, Texas, said lands being more particularly shown by the sketch attached to this instrument and marked C–9 for identification; that whereas, there is doubt and uncertainty as to the true location of the boundary lines of said surveys and their proper location on the ground is in dispute, which results in confusion and conflicts and no one owning land in said surveys can permanently improve the same without the fear of future disturbance and litigation and that by reason thereof the present owners of said land have not been able and are not now able to locate definitely and certainly the boundary line of their respective surveys: And now, therefore, for the purpose of permanently locating and establishing the lines and corners of the land which we own in said block, that conflict, disputes and probably litigation may be avoided, and that we may know with definiteness and certainty where our lines are located, and to be enabled to permanently improve the same, do hereby enter into this survey agreement, each of us binding ourselves, our heirs, executors and administrators to the full performance of each and every condition of this agreement. Further, therefore, we do hereby agree and have agreed to employ W. J. Williams, a competent surveyor and engineer of Plainview, Texas, to resurvey and mark on the ground the said boundary lines of our said tracts of land in said block and we do hereby further agree that the lines so run and surveyed by him and the corners erected by him, shall be taken and accepted by us as the true and correct lines and corners of said land and the same shall forever be binding on us, each of us and our heirs and assigns respectively. Provided, however, that before the said W. J. Williams begins said survey he shall be appointed special surveyor by the Commissioner of the general land office in order that the lines so established by him may be recognized by the commissioner of the General Land Office. Each of us, the signers hereto, further agree to yield possession of our said lands in accordance with the lines as run by the said W. J. Williams, giving to each other possession of the land to which he is entitled by said survey, peaceably and without litigation."

Other parts of said agreement provided that the said W. J. Williams should mark each corner of said tract; how said surveyor should be paid by the respective owners of the land employing him; that in the event any of the signers to the agreement should lose any land by reason of the survey then he should be compensated for such loss by each signer paying a proportionate part thereof; that the agreement should not be effective until signed by the owners of 60 per cent. of the land, included within the boundaries of said block C–9, and that the survey should be made within 60 days from the date of appointment of said surveyor by the commissioner of the general land office.

The agreement was signed by the required number of owners of land in said block; the said Williams was appointed and duly qualified as state surveyor, and thereafter within due time surveyed the block on the theory of location hereinafter referred to, establishing corners and furnishing field notes of each survey. These field notes were approved by the commissioner of the general land office, and duly filed in said office.

Section 4 of said block, owned by defendant, was north of section 7, the north one-half of which was owned by plaintiff, and the defendant refused to recognize the line between said sections as established by the said Williams. The plaintiff brought this suit in trespass to try title, and on said contract to recover said north one-half of said section 7, as defined by the boundaries established by the said Williams. The defendant answered that he was not bound by the Williams survey, because of the following facts, specially pleaded:

First. "That the said Williams survey, pleaded by plaintiff, was not authorized by or made in conformity with the survey agreement pleaded by plaintiff, in that the said W. J. Williams did not 'resurvey and mark on the ground' the boundary line of defendant's land; that said Williams in making said survey did not follow the original field notes of the defendant's land, but located same from other and different notes in a manner not authorized by said agreement." Second. "That the said Williams survey, alleged and set forth by the plaintiff as an agreed boundary, is void, in that the said survey attempts to apportion vacant land belonging to the state of Texas, among the various surveys in block C–9, Floyd county, Tex., and give said vacant land to the respective owners of the surveys in block C–9, the parties to said contract and the commissioner of the general land office of the state of Texas, not having the authority under the laws and Constitution of the state of Texas to so dispose of the vacant domain belonging to said state."

It appears from the record that block C–9 is a rectangle, or 20 sections of land, 5 sections east and west and 4 sections north and south. Section 1 is the northeast corner section of the block, and the sections are numbered consecutively from east to west and west to east, No. 20 being the southeast section of the block. The original survey, purported to

have been made by J. Summerfield in 1878. The original field notes of said section 1, called to begin for its northeast corner at the southeast corner of section 20, block B–4, and the northwest corner of section 2, block D–1. The field notes of each of the five north sections of the block call to the corner with stated sections of block B–4. Each of the east sections of the block call to corner with certain sections of block D–1. The field notes of each of the 20 sections call for a mound at each corner, no other call for any natural or artificial object being made. If these mounds were ever put in, there is no evidence that any of them were ever found, unless it be that at the southeast corner of section 20. It appears from the maps in evidence that the southeast corner of section 20, block C–9, the southwest and northeast corners of sections 24 and 25, block D–1 and the northeast corner of section 81, block D–2, are at a common point. It appears that there was, at the time of the said Williams survey, a large earth mound, which was accepted as being the southeast corner of said section 20. Whether it was put in as a corner for said section or for some one of the other sections cornering at this place does not appear, though the surveyor Williams stated in his report that the mound had the same appearance in' size and age as a mounment several miles to the east at the corner of another section in block D–1. Block B–4 is composed of 34 sections, purporting to have been surveyed by W. S. Jones, surveyor, in 1875. The field notes of the surveys of this block call to tie to block B–1, and call for stakes at the corner of each section. Block B–1 is a block of 100 sections, purporting to have been surveyed by the said W. S. Jones in 1875. The field notes of the sections of said block, with the exception of section 1, which calls for a monument at its beginning corner, also call for stakes for their corners. Block D–1, which, as we have seen, lies to the east of block C–9, was surveyed by J. Summerfield in 1877. It lies south of block B–4, and also calls to corner with the sections of said block. At the time of the Williams survey no original or recognized corner of any of the sections in either block B–1 or block B–4, could be identified on the ground except the original corner of section 1 of said block B–1.

Said Williams proceeded in the following manner in making the survey of the sections in block C–9: He accepted the earth monument already referred to as being the southeast corner of section 20, and from this point established the east and south lines of the block. The course used in locating these lines was determined by the course between the said mounds at the southeast corner of section 20 and that situated several miles to the east at the corner of another section of said block D–1. He ran course and distance from the recognized corner of section 1, block B–1, some 15 or 20 miles distant from block C–9, to establish the corners of block B–4, called for by the field notes of the surveys of block C–9. The course used in this run was that determined from observation on a bearing called for in the field notes from the recognized corner of said section 1, block B–1. The southeast corner of said section 20, thus located, was found to be 4.7 varas, a negligible distance under the circumstances, east of a prolongation of said east line of said block C–9, established by Williams, as indicated, but it was about 300 varas north of where the north line of block C–9 would be located by course and distance, from the said mound at the southeast corner of said section 20, block C–9. The said Williams, in surveying the sections of the said block C–9, gave effect to the calls of its field notes for the lines of block B–4. This resulted in an excess of 300 varas in the block north and south and in the corrected field notes of the surveys about 75 varas of this excess was apportioned to each section. In the letter of the commissioner of the general land office, appointing the said Williams as state surveyor to resurvey said block C–9, it is stated that upon the said Williams qualifying, instructions would be issued by the said land commissioner, indicating the plan of resurveying "as soon as data can be compiled." Whether any such instructions were issued and what they may have been, or what data may have been in the land office as to such matter, does not appear.

The appellant claimed that in the survey the block should have been constructed from the mound at the southeast corner of section 20 and the calls for the surveys, in block B–4 disregarded, and that there would be a strip of land belonging to the public domain 300 varas wide between said blocks C–9 and B–4. There was a conflict, amounting to 82 acres, in the location of sections 4 and 7, made by said Williams survey, and if located according to appellant's contention. The court gave the jury a peremptory instruction for the plaintiff, and the appellant's assignments assail this action.

[1-6] We think the agreement for survey is in the nature of an arbitration agreement. Such an agreement is valid and the award subject to impeachment only as in other cases. Hill v. Walker, 140 S. W. 1159; Myers v. Easterwood, 60 Tex. 107; C. J. vol. 9, p. 248; R. C. L. vol. 4, p. 126. If an award conforms to the submission, it may be impeached only for "fraud or partiality, misconduct, or gross mistake committed on the part of the arbitrators to the manifest injury of the party complaining." Payne v. Metz, 14 Tex. 60. "Nothing will be presumed against an award; on the contrary, every presumption not contradicted by proof will be admitted in support of it." Green v. Franklin, 1 Tex. 497. There was no pleading of fraud on the part of the arbitrator selected, and for this reason alone the issue was not in the

case (Fire Ass'n of Philadelphia v. Colgin, 33 S. W. 1004; Chambers v. Ker, 6 Tex. Civ. App. 373, 24 S. W. 1118), although some of appellant's propositions contend that the question of the surveyor's good faith should have been submitted to the jury. But, in any event, we do not think that there was any evidence of fraud or misconduct on the part of the surveyor. It was said in the case of Sanders v. Newton, 57 Tex. Civ. App. 319, 124 S. W. 482, that—

"In the absence of proof of gross and palpable error in the award, such charges of fraud on the part of the arbitrators are not sustained by evidence relating to the merits of the controversy decided."

[7-9] We will deal with this question of "gross and palpable error" later in connection with the question of mistake. We construe appellant's pleading to be an attack on the award on the ground that it does not conform to the submission, and this is the principal contention put forward by the assignments. Appellant's position, as we understand it, is that the agreement only authorized the surveyor Williams to "resurvey" the lines of block C–9, that is, to follow the footsteps of the original surveyor according to the field notes of the survey; that the survey made by the said Williams did not do this. As a part of this contention it is urged that the call of the field notes of survey C–9 for the corners of block B–4, was a mistake; that such call is for an unmarked open prairie line, and that the block should be built up by calls for course and distance from the mound at the S. E. corner of Section 20, and the calls for B–4 disregarded. For the following reason, stated in the form of two propositions, we think that this position cannot be maintained: (1) Because the agreement contemplated that all questions arising in reference to the application of the field notes to the facts as they existed on the ground should be determined and settled by the surveyor chosen, acting under instructions from the commissioner of the general land office, and consequently the award would be final as to such matters, in the absence of fraud, misconduct or gross mistake, as stated; and (2) the evidence is not sufficient, in face of the presumption in favor of the award, to make an issue that any such mistake was committed in the decision of such matter as would justify a court in setting the award aside. We will develop these propositions a little further, taking them up in the order stated.

The owners of the surveys in block C–9 were bound to have known that when the surveyor chosen by them took the field notes of the survey and went on the ground to locate the land therefrom the very first question which would arise would be as to the effect to be given to the calls of the field notes for the lines of blocks B–4 and D–1. The mere mechanical work of running out the lines by course and distance from a known and accepted corner would have been a simple matter, and could not have been the occasion for the "doubt and uncertainty" expressed in the agreement as to the boundaries, nor have required a resurvey of the land under authority of the land commissioner and the filing of corrected field notes of such survey. The agreement, as we have seen, required that the said Williams should be appointed a state surveyor, so that the lines established might be recognized, and he was so appointed, and the field notes of the survey made by him were approved by the commissioner of the general land office. Now article 5348 of the Revised Statutes provides that such surveyor "shall be under the control and direction of the commissioner of the general land office; and under such direction, may survey," etc. The agreement was made in view of all these facts, and we think it clear that the parties thereto intended that the survey should settle every question that might arise in the location of the land on the ground from the field notes of the surveys of the block, so that a determination of the question as to what should be done with the calls of block C–9 for the lines of block B–4 was within the submission agreement.

We doubt whether the pleading is sufficient to require a determination of the question as to whether there was any such mistake in the decision as to the manner of the survey as would require a submission of such issue, even if the facts warranted it. But we have considered the question, and think that in any event the facts are insufficient to raise the issue. First, as to the rule of law applicable to this subject, it is not every mistake of law or fact in the decision of the question under submission that will warrant interference with the award by the courts; otherwise, as has been said, the arbitration would settle nothing, and would be but the beginning instead of the end of litigation. It is difficult to state a general rule that will give a comprehensive idea of the character of mistake which will authorize relief. We have already quoted a rule stated in very general terms, taken from the decision of our Supreme Court, in the case of Payne v. Metz, supra. The following authorities may be consulted as elaborating on this question. 2 Story's Equity Jurisprudence (13th Ed.) pp. 789–793; 5 C. J. pp. 179–187; 2 R. C. L. pp. 392, 393. Let us now briefly refer to the facts in connection with the general rule stated and more particularly applied in the authorities referred to, and the further rule as to presumption, quoted from the case of Green v. Franklin, supra. The only evidence as to the manner of the survey of blocks C–9, B–4, or B–1, introduced, consisted of the field notes of those blocks. As we have seen, the only call for anything on the ground in the field notes of block C–9 is the call for a mound at every corner of each survey, and

the only calls for anything on the ground in block B–1 and B–4, are for stakes at each corner, except the call for the monument at the initial corner of section 1, B–1. Counsel argue that the call for stakes in the field notes of B–1 and B–4 meant nothing, but was merely a surveyor's way of calling for an unmarked point, and indicated that the lines were not actually run on the ground. This is probable, though we cannot judicially know it, no proof being offered in support of such conclusion; but it is equally probable that the call for mounds with no other description thereof, in the field notes of block C–9, were also calls for points. So on this theory it appears probable that there was but one original corner in blocks B–1, B–4, and C–9. If this be true, there might not have been any error in building up C–9 from B–4 and D–1. Kuechler v. Wilson, 82 Tex. 638, 18 S. W. 317; Coleman County v. Stewart, 65 S. W. 383; Steward v. Coleman County, 95 Tex. 445, 67 S. W. 1016. On the other hand, if the presumption is to prevail that all these lines were actually run out and the mounds and stakes put in, then the south line of B–4 was a marked line, and it would be entirely probable that it could have been easily found at the time of the survey of C–9. Again, C–9 calls for D–1 on the east, and the maps show that D–1 in turn called for B–4. None of the field notes of D–1 were introduced, nor was there offered evidence of any character as to what the surveyor Summerfield did in locating D–1 or C–9. It may be that a knowledge of Summerfield's actual work on the ground in surveying these lands would have thrown light on the question as to what was to be done with these calls for B–4. As we have seen, the land commissioner had authority to instruct the surveyor as to the manner of the survey, and he did state in his letter that such instructions would be issued, based on data in the land office. The evidence does not disclose whether any such instructions were issued, nor what data there was in the land office that would throw any light on the matter. It may have been that there was such data, from which it might have been fairly concluded that the survey ought to have been made as it was. The rule relied on by appellant, that a call for an unmarked prairie line will not prevail over a call for course and distance, is not inflexible, and its application depends on the facts and circumstances of each case. Maddox v. Fenner, 79 Tex. 279, 15 S. W. 237; Wyatt v. Foster, 79 Tex. 413, 15 S. W. 679; State v. Sulflow, 128 S. W. 652. We do not mean to say that the facts in evidence show that the surveyor was correct in giving effect to the calls for B–4, but we do hold that the facts in evidence and the absence of showing as to what other facts, if any, might have been considered by the land commissioner and surveyor in reaching their decision, are sufficient to enable us to say that the evidence is insufficient to overturn the presumption in favor of the award, or to show that the decision as to the manner in which the survey was to be made was the result of such gross and palpable mistake as would warrant a court in setting the award aside.

We think the trial court was correct in giving the peremptory instruction, and the judgment will be affirmed.