## STATE v. COLEMAN–FULTON PASTURE CO. (No. 6525.)

(Court of Civil Appeals of Texas. San Antonio. March 30, 1921.)

1. **Boundaries** ⊂⊐3(3)—**Natural monuments govern over courses and distances.**

While the intention of the surveyor in making an official survey will have an almost controlling effect in construing his work, such intention as evidenced by calls for courses and distances will not, where the survey was actually run, govern calls for natural monuments.

2. **Public lands** ⊂⊐175(½)—**State cannot recover for excess by seeking to declare vacancy.**

In case of excess, where a survey was actually run on the ground, the state cannot recover by seeking to tear surveys apart and declare a vacancy.

3. **Public lands** ⊂⊐175(½)—**Survey actually made cannot be disregarded because of excess.**

Where a survey is actually made, it cannot be disregarded because of an excess.

---

⊂⊐For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**4. Boundaries** ⬦⬦6—Courses and distances may be varied so as to connect with lines called for.

In view of act of October 20, 1866 (Acts 11th Leg. c. 41), amending Act May 1846 (Acts 1st Leg. p. 363), which was in force until adoption of Rev. St. of 1879, *held* with respect to surveys made during such period that courses and distances might be varied so as to connect with a line called for; it appearing that the surveyor intended to include all vacant land.

Appeal from District Court, Travis County; Ireland Graves, Judge.

Action by the State of Texas against the Coleman-Fulton Pasture Company. From a judgment for defendant, the State appeals. Affirmed.

C. M. Cureton, Atty. Gen., and E. F. Smith and W. W. Caves, Asst. Attys. Gen., for the State.

Templeton, Brooks, Napier & Brown, of San Antonio, and James R. Dougherty, of Beeville, for appellee.

COBBS, J. This suit was brought by appellant to recover of appellee a strip of land alleged by appellant to be vacant and unappropriated public domain. The right to recover the land is based and depends upon the true location upon the ground of the George Reynolds, T. Perez, Dakin & Dakin L. S. No. 661, Dakin & Dakin L. S. No. 662, Dakin & Dakin L. S. No. 659, Williams & Downs, A. B. Van Benthuysen, William Steel No. 2, William Steel No. 3, George W. Fulton, Jackson Crouch and Levi English, which, if located as contended by appellant, leaves a vacancy. Appellant says, though there is considerable testimony in the record in reference to the R. M. Williamson, B. H. Freeling, and D. McDonald and other surveys, they are not regarded as important in determining and accounting for errors in certain maps and plats introduced in evidence.

Appellant also concedes there is no issue between appellant and appellee as to the location upon the ground of the Blucher "Base line," the south corner of the Levi English survey, the shore line or lines, including their various projections and indentations of Puerta Bay, Copano Bay, the eastern Mud flat, Aransas river, Chiltipin creek, the west Mud flat, and the large or central Mud flat and Mud Flat dam. As to these objects the "Blucher State Map" and the "Blucher Defendant Map," introduced in evidence, are the same, and correctly indicate the location and relative position on the ground of these several objects. The maps are on the same scale, and are true to the scale indicated thereon. The appellant concedes if the land is found to be included in any patent, grant, or grants, the judgment of the trial court should be affirmed.

The contention of appellee is that there was no public unappropriated domain within the limits and boundaries of the field notes described in plaintiff's petition, but that the same have been appropriated and passed out of the state through its patents and now owned by appellee.

The foregoing statement and admissions reduce this case to a simple boundary suit, the result of which depends upon the true construction of the line and boundaries of certain surveys to determine the northern boundary line of the D. C. Barrett survey in question, and the location of the boundary line of those surveys called for by the Barrett and adjacent surveys to it on its northern boundary line. The case was submitted without a jury, and a general judgment was rendered by the trial court against appellant and in favor of appellee for the land.

The testimony is very voluminous, and supports the judgment of the court. The trial court was not requested to make special findings, and therefore we must assume that every theory or phase of the testimony is found by him to support his judgment.

The Blucher maps referred to in the foregoing statement by appellant represent two large separate maps introduced in evidence. The first is marked No. 6 "Blucher State Map." This map was made by Blucher under the direction of the state to show how the surveys would be located by their calls for course and distance alone, disregarding the calls of their field notes for the natural objects found by Mr. Blucher in making his survey, based upon the theory that calls for natural objects should be disregarded and precedence given over same to the calls for distance. The second, called "Blucher Defendant Map" No. 7 is made by him as showing the true location of the various surveys as actually located by him by his survey made on the ground. His testimony shows he spent several months in making the survey, and gives in detail a lengthy description of his work done on the ground, and why the surveys must be made and located by their field notes, shown on "Defendant Blucher Map," in order to give effect to the calls of the original field notes for natural objects which he found on the ground in making his said survey, and cannot be properly otherwise located except by disregarding a great number of calls for the natural objects called for in their field notes found by him on the ground so as not to disregard the calls for a great many natural objects and to tear the surveys loose from each other, thereby giving effect and dignity to the calls and position of all surveys, just as they are truly represented by the plats and maps in use in the General Land Office.

We must commend the able counsel on

both sides for their exhaustive preparation of the case and their splendid briefs presenting their respective views and contentions, which has greatly lightened our work.

As the maps so made by Blucher of the contention of each side will make more clear the land sued for and claimed by each party, and for a better understanding of the issues in this case, we have caused the two maps to be consolidated in one, showing the conflicting claim of the state placed over the other surveys of appellee.

ᴜɪɪɪɪɪɪ WHITE LINE,      ‗‗‗‗ RED LINES,

The white lines are the lines of the Barrett and contiguous surveys as contended for by defendant Pasture Company and as located by surveyors Blucher. In so locating said lines, the surveyor gave preference to the calls for natural objects and to the calls for the lines and corners of adjoining surveys over the calls for distance.

· The inner red line is where the state claims the line of the Barrett should be located. The line can be so located only by giving preference to the calls for distance over the calls for the lines and corners of the adjacent surveys.

The outer red line is where the state claims the lines of the surveys called for in the Barrett field notes should be located. The line can be so located only by giving preference to the calls for distance over the calls for natural objects and for the lines and corners of adjoiners.

The land lying between the two red lines is the land claimed by the state to be vacant, and sued for in this case.

This map is not a copy of the entire Blucher maps, but only of so much as to show the surrounding surveys and the claimed vacancy.

A brief staetment of how some of the surveys were made is perhaps of some value in elucidating the situation:

Surveys Nos. 1 to 13, inclusive, were located by John R. Talley, deputy surveyor of Refugio county, the certificates to the field notes showing the making of said locations being dated September 23, 1839, and the said certificates of the locating surveyor showing that the said surveys were "made since the 1st day of August, 1838." The said surveys were made for Henry Smith, assignee, and are indicated on the Blucher maps as follows: No. 1, A. B. Van Benthuysen; No. 2, Wm. Steel; No. 3, Wm. Steel; No. 4, S. M. Quin; No. 5, S. M. Quin; No. 6, J. Downing; No. 7, J. Downing; No. 8, D. McDonald; No. 9, B. H. Freeling; No. 10, A. Marsh; No. 11, A. Marsh; No. 12, L. Martin; No. 13, L. Martin.

The Williams & Downs, the three Dakin & Dakin and the Geo. W. Fulton surveys were located by W. Richardson, surveyor, his certificate showing that each of said surveys was located February 28, 1842."

There were some 30 other surveys that bore more or less on the subject. Six were made between September 21, 1854, and June 15, 1855, by Wm. R. Reid, surveyor; 11 made between January 16, 1857, to November 12, 1860, by P. S. Hagy, surveyor; 13 made between January 25, 1862, and May 12, 1872, by James O. Gaffney, surveyor. James O. Gaffney is the surveyor who made and located the D. C. Barrett survey, of which the lines of the northern portion are in controversy.

The surveys up to August, 1872, left a large body of vacant land lying between surveys on the south bordering on the Nueces and Corpus Christi Bays and the surveys on the north bordering on Chiltipin creek, the Aransas river and Copano Bay. Thereafter, Maj. Felix A. Blucher, deputy county surveyor, located a large number of the surveys on this vacant land. He died long years ago, but left field notes showing the work done on the ground. It shows he ran lines

from the Martin survey in a southerly direction to the Martinez surveys, and thence on to McGloins Bluff on Corpus Christi Bay. C. F. Blucher, his son, who made the two maps above, testified as being with his father in the capacity of chain carrier, and that the lines shown in his father's field notes were actually run on the ground, that is, the base line connecting the Larkin Martin and upper surveys, at the dates mentioned, and that Surveyor James O. Gaffney was with them in making some of the surveys.

The following surveys were located by Major Blucher between August 27 and September 9, 1872; the Manuel Ramon, the Robert Saddler, the Juan Garcia, the George Clark, the J. M. Manchaca, the John Gibbs, the Wm. Keizer, the Isaac Sterling, the two George Sargent, the S. A. & M. G. R. R. No. 20/200, the A. Hayleger, the two Jackson Crouch, the John Lee, the Wm. Smith, the P. Bryody, the S. W. Perry, the Richard Faulk, the A. Bergara, the Salvador ·Flores, the Wm. Burns, the C. C. Hornsby, the R. M. Williamson, the P. Mahoney, the James Orrick, the J. B. Bryan, and the M. Kinney—in all, 28 surveys.

C. F. Blucher testified, respecting the making of these 28 surveys by Major Blucher, that "there was no other surveying done during those days, except what is recorded in my father's book"; the book referred to being the book showing the survey made and lines actually run August 29, 1872, to September 7, 1872, which shows that none of the lines of the 28 surveys were actually run on the ground.

After these surveys were made the supposed vacancy existed as now represented by the Barrett survey as shown on the Blucher Defendant Map, whereupon Thomas M. Coleman made application on April 17, 1873, for location thereupon, as vacant public domain by virtue of a valid certificate No. 30/146, issued by the Commissioner to D. C. Barrett, deceased, to cover the vacant land situated between Theodore Perez, Van Benthuysen, Wm. Steel, Geo. W. Fulton, Robt. M. Williamson, Jackson Crouch, Salvador Flores and others west as may be practicable.

The application also called to enter for location another certificate for one league and labor, issued to John McKee, to be surveyed west and adjoining the foregoing entry to cover the remaining vacancy so far as it would go.

The D. C. Barrett certificate was surveyed and located by James O. Gaffney in accordance with the application calling for the same surveys as represented by the file, the field notes of the survey, the maps in the land office and carried into the patent—all showed this land sued for to come within the description of the field notes in the grant —and tying on other surveys whose location has been identified by the testimony as showing no vacancy now.

[1, 2] The intention of the surveyor reading from the testimony of the witnesses and the data in the land office show the very apparent purpose of the locator to acquire the land within the description of the field notes, and patent appropriating thereby the land in controversy. We see no reason, fact, or argument that can justify the conclusion that the surveyors in this case in locating lines would have ever left a space between surveys of such conformation as the state claims was made between all such surveys adjacent and called for in the field notes. The contention of the state is in exact opposition to the correct theory that obtains in locating and reconciling surveys. The intention of the surveyor as expressed in his work in making office surveys must have an almost controlling effect in construing his work, in the absence of a better reason to ignore it. The intention would not control if the footsteps of the surveyor was actually made and could be found and identified on the ground by fixed and identified calls for location objects. State v. Palacios, 150 S. W. 229; Robinson v. Doss, 53 Tex. 496; Coleman County v. Stewart, 65 S. W. 383.

We have not had our attention called to any case as authority for a suit like this; that is, where all the field notes in a grant call for adjacent surveys as this, and represent no vacant land apparent from all the files, surveys, field notes, maps, and plats in the General Land Office, and finally are embraced in a patent, that the state may declare a vacancy between surveys fitting on to each other, and make new field notes, tearing apart and separating the contiguous and companion surveys, thereby wedging in a vacancy, and call it unappropriated public domain, in order to sue for it as public domain. This is not the method of reforming a grant so as to recover an excess.

If the theory of the state is to give the Barrett its full quantity of land, and take the excess, if any, on the north by either tearing them apart and slide some further north, or slide the Barrett down, to accomplish such a result, as shown by the "Blucher State Map," we must hold with the trial court there is no vacancy.

[3] The amount or excess in this survey is but an evidence against appellant's contention, as said by Mr. Jutice Henry in Maddox Bros. & Anderson v. Fenner, 79 Tex. 292, 15 S. W. 239, that—

"Such excess, however, has never been held by this court a ground for disregarding surveys actually made. In this case the greatness of the excess is not without force as an argument indicating that the surveyor actually intended to make the Stevens embrace all of the land left by the surrounding surveys. It is apparent that by an actual survey he would

have been able to locate a survey of 800 acres in the vacancy beginning at the Ryan southwest corner in some regular shape, and that the irregular and peculiar shape given to the Stevens, as is evidenced by the calls of the patent, was adopted because he was acquainted with the boundaries of the surrounding surveys, and intended to make a survey conforming accurately to them as they then appeared."

[4] In other words, it is in favor of the argument that the surveyor intended to cover all that vacant land represented in the land office maps as vacant and the calls adopted because "he was acquainted with the boundaries of the surrounding surveys, and intended to make a survey conforming accurately to them as they then appeared."

It is contended by the state, and the testimony tends to support it, if there is an excess in the Williams & Downs and the three Dakin & Dakin surveys located for the same assignee, yet a great portion thereof is submerged marsh, water lands, and are worthless, and probably difficult of accurate identification. But that is of no consequence here.

Our attention has been called to section 1 of the act of October 20, 1866 (Acts 11th Leg. c. 41), amending act of May, 1846 (Acts 1st Leg. p. 363), which was in force until the adoption of the Revised Statutes in 1879 as follows:

"Be it enacted by the Legislature of the state of Texas: That in all suits for the trial of title to land, where the field notes of the survey call to run to a line in the prairie, or where there are no objects along which the line might be marked, the course and distance of a line so calling for another, may be varied so as to connect with the line so called for, where the same has been or may be ascertained and determined by actual survey."

It is very difficult to lay down any more certain and fixed rule for the government of surveyors in making surveys than those rules laid down in Booth v. Upshur, 26 Tex. 70, universally followed and cited with unanimous approval. The opinion for the court was written by Justice Roberts.

Mr. Justice Jenkins in State v. Sulflow, 60 Tex. Civ. App. 615, 128 S. W. 652, states the general rule in very apt language.

The real purpose of all surveying is to segregate a piece of land and with field notes according to well-established principles of law that will fix its identity and enable one to find it.

It would serve no useful purpose to further elaborate and discuss the numerous facts, and set forth the various calls of adjacent and identifying surveys upon which the proof of this case depended, upon the voluminous testimony introduced that satisfied the trial judge. The facts are sufficient

to support his judgment, and we do not believe he has committed any error of law in the trial and disposition of this case, and the judgment of the court is affirmed.